[Crim. No. 15176. In Bank. Dec. 20, 1971.]

In re JOSE L. GONZALES on Habeas Corpus.

## COUNSEL

Albaum & King and Walter H. King for Petitioner.

Evelle J. Younger, Attorney General, and Jerold A. Prod, Deputy Attorney General, for Respondent.

## OPINION

**BURKE, J.**—This case presents the question of the extent to which the Lanterman-Petris-Short Act (the "LPS act" or the "act"), commencing with section 5000 of the Welfare and Institutions Code,[1] applies to court commitments of mentally ill persons made under preexisting law. Petitioner, who was committed to Atascadero State Hospital as a mentally ill person by the Los Angeles Superior Court in April 1969, seeks release under provisions of the LPS act. As will appear, we have concluded that petitioner has not shown that he is entitled to release at this time; rather he should be considered as a candidate for the benefits of conservatorship proceedings under provisions of the new act.

From the record it appears that petitioner, who admittedly had killed his girl friend by knifing, was charged with murder and was originally sent to Atascadero pursuant to Penal Code sections 1368-1370 as unfit to proceed in his own defense. At the hospital he received antipsychotic medication and on February 20, 1969, he was returned to court as fit to proceed with his defense. He was found not guilty by reason of insanity but presently sane. However, he was thereupon again (on April 21, 1969) sent to Atascadero as a mentally ill person who was a danger to others, on civil commitment for an indeterminate period under former section 5567, Welfare and Institutions Code.[2]

---

[1]Added in 1967 and operative July 1, 1969; Statutes 1967, chapter 1667, page 4074, section 36.

All section references are to the Welfare and Institutions Code, unless otherwise indicated.

[2]Former section 5567, in pertinent part: "If, after examination and certificate have been made, the judge believes that the person is . . . of such mental condition that he is dangerous to himself or to the person or property of others, and is in need of supervision, treatment, care, or restraint, the judge may adjudge the person to be mentally ill, and may . . . make and sign an order . . . (b) That the person be committed to the Department of Mental Hygiene for placement in a state hospital. . . ."

Section 5567 was repealed, operative July 1, 1969—the operative date of the LPS act.

In April 1970 petitioner sought release on habeas corpus from the Superior Court in San Luis Obispo County,[3] which was denied. He has now applied to this court, claiming to be entitled to release under provisions of the LPS act which became operative after petitioner's 1969 civil commitment under former section 5567. (See fns. 1 and 2, *ante*.)

In *Thorn* v. *Superior Court* (1970) 1 Cal.3d 666 [83 Cal.Rptr. 600, 464 P.2d 56], we considered the nature and the adequacy of notice to a person detained for 72-hour treatment and evaluation under the LPS act, of his certification for an additional 14 days of involuntary intensive treatment, and of his right to challenge the certification.[4] The act authorizes both the 72-hour detention upon "reasonable cause" and the subsequent 14-day certification of a person who "as a result of mental disorder" is "a danger to others, or to himself, or gravely disabled." (§§ 5150, 5250 et seq.) The act does not define the term "danger," "mental disorder," or "reasonable cause." So far as here pertinent, it defines "gravely disabled" as "a condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter." (§ 5008, subd. (h).)

The act also provides for "postcertification treatment" of not to exceed 90 days, following the 14-day certification period, of a mentally disordered person who had been taken into custody as a result of his attempted or inflicted physical harm upon the person of another or who had threatened, attempted or inflicted such physical harm while in custody, and who presents an imminent threat of substantial physical harm to others. (§ 5300 et seq.) A person proposed for postcertification treatment is entitled to be represented by counsel and to demand a jury trial. (§ 5302.) If after a hearing the court remands him for such treatment he must be released at the end of the 90 days, unless a new postcertification petition is filed on the ground that he has threatened, attempted or actually inflicted physical harm to another during the prior 90-day postcertification treatment, and presents an imminent threat of substantial physical harm to others. (§ 5304.)[5]

---

[3]The county in which Atascadero State Hospital is located. (See former § 6620.)

[4]As noted in *Thorn*, the LPS act repealed the principal provisions for the civil commitment of mentally ill persons found in prior California law and inter alia replaced them with a new statutory scheme doing away with the indeterminate commitment, removing legal disabilities previously imposed upon persons adjudicated to be mentally ill, and emphasizing voluntary treatment, with periods of involuntary observation and crisis treatment for persons who are unable to care for themselves or whose condition makes them a danger to themselves or others. (P. 668 of 1 Cal.3d.)

[5]Thus it appears that under the LPS act a mentally disordered person who is dangerous to others or to himself may be detained for the 72-hour evaluation and treatment and for the additional 14-day involuntary intensive treatment upon certifi-

As stated, the mentally disordered who may not be dangerous but who are gravely disabled (unable to care for themselves) may be detained for the 72-hour evaluation and for the 14-day certification treatment.

Thereafter[6] the court may appoint a conservator for such a person (and for those gravely disabled as a result of chronic alcoholism), with the right to a jury trial on the issue of whether he is gravely disabled. (§ 5350, subd. (d).) Among the powers of the conservator, if specified in the court order, is that of placing the conservatee in "a medical, psychiatric, nursing, or other state-licensed facility, or a state hospital, county hospital . . . " etc. (§ 5358.) The conservatorship automatically terminates at the end of one year unless the conservator timely petitions for successive one-year periods on the ground that the conservatee is still gravely disabled. (§ 5361.) The conservatee may himself petition the court at any time, but not more often than once each six months, for a rehearing as to his status as a conservatee. (§ 5364.)

Section 5366 declares inter alia that court commitment to a state mental hospital of a *mentally disordered* or chronic alcoholic patient *who is gravely disabled,* ordered *under* the *law* in effect *prior to* the operative date of the *LPS act* (July 1, 1969), shall terminate and the patient shall be released if a conservatorship petition is not filed for him by July 1, 1972—unless he agrees to accept treatment on a voluntary basis. Section 5366 further directs that the officer providing conservatorship investigation for each county shall investigate the need for conservatorship for such patients from that county and shall file, not later than July 1, 1972,[7] a conservatorship petition for those patients that he determines may need conservatorship.

Section 5367 provides that *"Conservatorship* established under this chapter *shall supersede* any *commitment under former provisions* of this code *relating to* inebriates or *the mentally ill."* (Italics added.)[8]

---

cation proceedings, plus an additional 14 days' treatment upon a second certification notice, of suicidal persons (§§ 5260-5268), even though he has not threatened, attempted or inflicted physical harm upon the person of another. However, such an overt act toward another seems to be required by the statute as a condition of both the first and of any subsequent 90-day postcertification treatment.

[6]As provided in chapter 3 (§ 5350 et seq.).

[7]The provisions of section 5366 referred to in the text were added by 1970 amendment. The two references to July 1, 1972, which now appear in the section resulted from amendment in 1971 extending the date for one year; the date specified by the 1970 statutes which added the provisions was July 1, 1971. (Stats. 1970, ch. 1627, § 26; Stats. 1971, ch. 242.)

[8]Also, section 5007 declares that "Unless otherwise indicated, the provisions of [the LPS act] shall not be construed to apply retroactively to terminate court commitments of mentally ill persons or inebriates under the preexisting law."

As stated, after petitioner was found not guilty of murder by reason of insanity but presently sane, he was again, in April 1969, sent to Atascadero as a mentally ill person dangerous to others, on civil commitment under former section 5567. (See fn. 2, *ante.*) It appears that during the two months he had been away from the hospital after his first commitment (during which two months his trial took place) he had not received antipsychotic medication and had reverted to violent and dangerous behavior. The committing court declared that the evidence was overwhelming that petitioner was still a danger to others, especially females; that if in proximity with a girl he could again suffer a loss of contact with reality and kill her in the same manner; that until "this mental defect can be reversed or in some manner compensated for" it would be extremely dangerous to others to release petitioner.

At petitioner's habeas corpus hearing of April 1970 in the San Luis Obispo Superior Court (see fn. 3, *ante,* and accompanying text), the medical testimony was uncontradicted that when petitioner was returned to Atascadero under the April 1969 commitment he was extremely violent, threatening, dangerous and uncontrollable. Accordingly sedative medication was administered and has been maintained in order to control petitioner's violent and dangerous behavior and to protect hospital personnel. Dr. Owre, assistant medical director of the hospital and petitioner's treating physician, testified that petitioner remains psychotic and dangerous to women, that his recovery prognosis is poor, that he was an out-patient under a psychiatrist's care when he killed and that in-patient treatment is therefore preferable, that if petitioner were released and he failed to take antipsychotic medication he would revert to violent behavior, that petitioner is "one of the most dangerous men I have ever examined."[9] Dr. Morgan, medical director of Atascadero State Hospital, agreed with Dr. Owre's opinion and with the conclusion that petitioner would become violent and dangerous if released and off antipsychotic medication. There was no contrary medical evidence.

A February 1971 staff report on petitioner's condition states that he "still has grandiose thinking and remains dangerous when psychotic. He is un-

---

[9]Dr. Owre also pointed up to the court the dilemma faced in determining whether on the one hand to keep petitioner on medication in the hospital and so control his violent behavior, thereby preventing him from performing the overt act that would provide a basis for detention under the 90-day postcertification procedure of section 5300 et seq. (see fn. 5, *ante*)—with the consequent risk that he would be released and again wreak harm upon a member of the public; or, on the other hand, to take petitioner off medication while still in the hospital, with the probability that he would revert to violent behavior toward the hospital staff and other patients but would at the same time by his violence provide the basis for the 90-day postcertification procedure.

able to provide food, clothing and shelter for himself when he is not taking antipsychotic medication. He believes he has improved in the area of self-knowledge, enough so he does not need hospitalization, and medication. His insight and judgment as a consequence are grossly inadequate. He is unable to obtain psychiatric treatment voluntarily when he is psychotic, because he becomes grandiose. For these reasons he is gravely disabled and needs a conservatorship."[10]

We are persuaded that the Legislature intended that one committed as dangerously mentally ill under former section 5567 (fn. 2, *ante*), as was petitioner, should neither be automatically released under provisions of the new LPS act (§ 5007, fn. 8, *ante*),[11] nor should he be deprived of the medication he needs to control his violence, in order to provide a basis for continued detention for his own safety and that of the public. (See fns. 5, 9, *ante*.) Instead, he is to be accorded the benefits of conservatorship proceedings (with the right to a jury trial, § 5350, subd. (d)) under the new act which, as noted, declares in section 5367 that such conservatorship shall supersede any commitment under former provisions relating to the mentally ill. The conservator may then, with court authorization and pursuant to provisions of section 5358 (see fn. 6, *ante*, and accompanying text) continue placement of the patient in a state or county hospital or other suitable state-licensed facility, with court review of the conservatorship at intervals of not longer than one year (§ 5361) and with the right in the patient to seek review every six months. (§ 5364.)

Such an approach accords those committed under former provisions of the law the same protections and rights of review, procedural and otherwise, as are provided to those detained under the new LPS act, and so does not deny equal protection of the law to the former group of patients. (See *Baxstrom* v. *Herold* (1966) 383 U.S. 107, 110-111 [15 L.Ed.2d 620, 623-624, 86 S.Ct. 760].) Additionally, the period allowed by the Legislature (to July 1, 1972, see fn. 7, *ante*) for the filing of conservatorship petitions

---

[10]A September 1971 staff report relates that petitioner's "grandiose thoughts are still evident in unguarded moments; at a feeling level, he has no appreciation of the crime he committed, nor does he really feel that it was wrong. . . . [He] remains psychotic and dangerous. Simply because he has made a good hospital adjustment and because he has been medicated so that blatantly psychotic symptoms are not in evidence, does not negate the basic fact that he is dangerous."

We are informed that conservatorship proceedings have not yet been instituted with respect to petitioner, as the Legislature has extended the period for one year, to July 1, 1972. (See fn. 7, *ante*.)

[11]Indeed, at the habeas corpus hearing in the San Luis Obispo Superior Court petitioner's counsel, although seeking petitioner's release under the LPS act, declared that "Arguendo, I can say that I think [that if] someone in the condition of Mr. Gonzales would be dismissed *as* [*sic*] a disgrace."

by the county conservatorship officer is clearly a reasonable transitional interval provided for the purpose of permitting consideration of the condition and circumstances of the various patients detained under former law.

The order to show cause, having served its purpose, is discharged, and the writ of habeas corpus is denied without prejudice to petitioner's right to again seek relief by habeas corpus, in an appropriate court, if no conservatorship petition has been filed for him by July 1, 1972.

Wright, C. J., McComb, J., Peters, J., Tobriner, J., Mosk, J., and Sullivan, J., concurred.