[Crim. No. 19558. July 18, 1977.]

In re ROGER S., a Minor, on Habeas Corpus.

922

## COUNSEL

Paul N. Halvonik, State Public Defender, Clifton R. Jeffers, Chief Assistant State Public Defender, Ezra Hendon, Deputy State Public Defender, William C. Connel, Public Defender, and Thomas Petersen, Deputy Public Defender, for Petitioner.

Robert L. Walker and Peter B. Sandmann as Amici Curiae on behalf of Petitioner.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, Robert R. Granucci and Ronald E. Niver, Deputy Attorneys General, for Respondent.

## OPINION

**WRIGHT, J.**[*]—By petition for writ of habeas corpus Roger S., a 14-year-old minor, seeks release from the Napa State Hospital to which he was admitted on May 10, 1976, on application by his mother made pursuant to Welfare and Institutions Code section 6000, subdivision (b).[1] Petitioner asserts that his confinement is unlawful, arguing that section 6000, subdivision (b)[2] does not afford procedural due process to minors "voluntarily" admitted thereunder. He further asserts that section 6000, subdivision (b) denies equal protection to such minors because it permits their admission even though they are neither "gravely disabled" nor

---

[*]Retired Chief Justice of California sitting under assignment by the Acting Chairman of the Judicial Council.

[1]Unless otherwise specified all references are to the Welfare and Institutions Code.

[2]Section 6000 provides: "Pursuant to the rules and regulations established by the State Department of Health, the medical director of a state hospital for the mentally disordered or mentally retarded may receive in such hospital, as a boarder and patient, any person who is a suitable person for care and treatment in such hospital, upon receipt of a written application for the admission of the person into the hospital for care and treatment made in accordance with the following requirements:

"(a) In the case of an adult person the application shall be made voluntarily by the person at a time when he is in such condition of mind as to render him competent to make it or, if he is a conservatee with a conservator of the person or persons and estate . . . by his conservator.

"(b) In the case of a minor person, the application shall be made by his parents, or by the parent, guardian or other person entitled to his custody to any of such mental hospitals as may be designated by the Director of Health to admit minors on voluntary applications. . . ."

dangerous to themselves or others, a standard which applies to minor wards of the court, and denies them the procedural protections to which wards are entitled under the Lanterman-Petris-Short Act. (§§ 5000-5401; *In re Michael E.* (1975) 15 Cal.3d 183 [123 Cal.Rptr. 103, 538 P.2d 231].)

We have concluded that although the personal liberty interest of a minor is less comprehensive than that of an adult, and a parent or guardian not only may but must curtail that interest in the proper exercise of his obligation to guide the child's development, in the area of admission to a state hospital a minor of 14 years or more possesses rights which may not be waived by the parent or guardian. Among these rights is the right guaranteed under the Fourteenth Amendment to the United States Constitution, and article I, section 7(a) of the California Constitution, to procedural due process in determining whether the minor is mentally ill or disordered, and whether, if the minor is not gravely disabled or dangerous to himself or others as a result of mental illness or disorder, the admission sought is likely to benefit him.[3] We shall explain below the basis for our conclusion and, as guidance to the Legislature in formulating new statutory procedures to protect these minors against possible arbitrary admission to mental hospitals, we shall outline those procedures which will afford at least those minimum protections to which they are constitutionally entitled.

### The Liberty Interest of Minors

"Personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions." (*People* v. *Olivas* (1976) 17 Cal.3d 236, 251 [131 Cal.Rptr. 55, 551 P.2d 375].) It is beyond dispute that a principal ingredient of personal liberty is "freedom from bodily restraint" (*Meyer* v. *Nebraska* (1923) 262 U.S. 390, 399 [67 L.Ed. 1042, 1045, 43 S.Ct. 625, 29 A.L.R. 1446]) and that minors as well as adults are "persons" under the Constitution who are entitled to the protection of that right. (*Tinker* v. *Des Moines School Dist.* (1969) 393 U.S. 503, 511 [21 L.Ed.2d 731, 740, 89 S.Ct. 733].) Only last term the United States Supreme Court reaffirmed the right of minors to constitutional rights and protection. "Constitutional rights do not mature and come into being magically only when one attains the state-defined age of majority. Minors, as well as

---

[3] We have no occasion in the instant case to consider the lawfulness of the section 6000, subdivision (b) admission procedure as applied to children under 14 years of age, nor do we consider here whether parents may compel minors 14 years of age or older to submit to medical and/or psychiatric treatment in a closed private facility, or on an outpatient basis.

adults, are protected by the Constitution and possess constitutional rights." (*Planned Parenthood of Cent. Mo.* v. *Danforth* (1976) 428 U.S. 52, 74 [49 L.Ed.2d 788, 808, 96 S.Ct. 2831, 2843].)

■ It is equally well established, however, that the liberty interest of a minor is not coextensive with that of an adult. "[E]ven where there is an invasion of protected freedoms 'the power of the state to control the conduct of children reaches beyond the scope of its authority over adults.'" (*Ginsberg* v. *New York* (1968) 390 U.S. 629, 638 [20 L.Ed.2d 195, 203, 88 S.Ct. 1274]; *Prince* v. *Massachusetts* (1944) 321 U.S. 158, 170 [88 L.Ed. 645, 654-655, 64 S.Ct. 438].) Parents, of course, have powers greater than that of the state to curtail a child's exercise of the constitutional rights he may otherwise enjoy, for a parent's own constitutionally protected "liberty" includes the right to "bring up children" (*Meyer* v. *Nebraska, supra,* 262 U.S. 390, 399 [67 L.Ed. 1042, 1045]), and to "direct the upbringing and education of children." (*Pierce* v. *Society of Sisters* (1925) 268 U.S. 510, 534-535 [69 L.Ed. 1070, 1077-1078, 45 S.Ct. 571, 39 A.L.R. 468].) As against the state, this parental duty and right is subject to limitation only "if it appears that parental decisions will jeopardize the health or safety of the child, or have a potential for significant social burdens." (*Wisconsin* v. *Yoder* (1972) 406 U.S. 205, 234 [32 L.Ed.2d 15, 35, 92 S.Ct. 1526].)

■ It is settled that a minor is entitled to the protections of due process whenever the state itself initiates action, whether civil or quasi-criminal, to deprive a minor of his liberty. (*In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]; *Goss* v. *Lopez* (1975) 419 U.S. 565, 574 [42 L.Ed.2d 725, 734-735, 95 S.Ct. 729]; *In re Winship* (1970) 397 U.S. 358, 367 [25 L.Ed.2d 368, 377, 90 S.Ct. 1068]; *In re Arthur N.* (1976) 16 Cal.3d 226 [127 Cal.Rptr. 641, 545 P.2d 1345].) We have not had occasion heretofore, however, to consider whether the minor may assert the same or similar rights when a parent already entitled to his custody and control initiates the action in the exercise of the parent's responsibility to obtain for the minor that care which the parent reasonably believes necessary to the proper upbringing of his child.

Petitioner assumes, and respondent does not dispute, that the detention of Roger in a state hospital is "state action," and that the state, albeit at the behest of Roger's mother, is therefore a significant participant in depriving Roger of the greater personal liberty which he would have outside the hospital. Respondent also recognizes, as he must, that even a conditional liberty interest, such as that of a minor, is entitled to the

protections of due process when the state is involved to any significant degree in its diminution. (Cf. *Morrissey* v. *Brewer* (1972) 408 U.S. 471, 484 [33 L.Ed.2d 484, 496, 92 S.Ct. 2593].) The parties do not agree, however, on what process is due, nor do they address themselves to the question of a parent's power to waive or otherwise relinquish his child's due process rights. We shall address the latter question first.

## The Extent of Parental Power

If, within his power to direct his child's upbringing, a parent may place the child in a state operated mental hospital and require him to remain there, just as he may place the child in a public hospital for treatment of a physical condition, it follows that he may waive those due process rights that the child might assert if the state sought the hospitalization. As noted above, we have concluded that as to minors 14 years of age or older, the parental power is not this comprehensive. The consequences of confining a person, minor or adult, involuntarily in a mental hospital are quite different and impinge much more directly on the liberty interest of the patient than does confinement for treatment of physical illness. Not only is there physical restraint, but there is injury to protected interests in reputation (see *Goss* v. *Lopez, supra,* 419 U.S. 565, 574 [42 L.Ed.2d 725, 734-735]; *Wisconsin* v. *Constantineau* (1971) 400 U.S. 433, 437 [27 L.Ed.2d 515, 519, 91 S.Ct. 507]), an interest in not being improperly or unfairly stigmatized as mentally ill or disordered. (*People* v. *Burnick* (1975) 14 Cal.3d 306, 321 [121 Cal.Rptr. 488, 535 P.2d 352].) Additionally, we note again the uncertainties in psychiatric diagnosis and the divergence of expert views (*People* v. *Burnick, supra,* 14 Cal.3d 306, 326) which render the possibility of mistake significantly greater than in diagnosis of physical illness. We are not alone in recognizing these uncertainties. (See *O'Connor* v. *Donaldson* (1975) 422 U.S. 563, 579 [45 L.Ed.2d 396, 409, 95 S.Ct. 2486], conc. opn. of Burger, C. J.) The serious consequences attendant upon involuntary commitment of a minor as a mentally ill or disordered person, and the significant potential for error in diagnosis convinces us that a minor who is mature enough to participate intelligently in the decision to independently assert his right to due process in the commitment decision must be permitted to do so.

We recognize that permitting the child to independently assert his right does to some extent conflict with parental authority, but a substantial state interest justifies recognition of the minor's right. The United States Supreme Court, in confirming the right of a parolee to due process in proceedings to revoke parole, recognized a similar interest.

"The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole .... And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness." (*Morrissey* v. *Brewer, supra,* 408 U.S. 471, 484 [33 L.Ed.2d 484, 496].) Here, too, society has an interest in the future development of the child, in avoiding diagnosis and/or commitment based on erroneous information and evaluation thereof, and in assuring the child fair treatment. An erroneous conclusion by a parent that his child is mentally ill or in need of treatment in a closed mental hospital facility might well "jeopardize the health or safety of the child, or have a potential for significant social burdens," factors recognized by the United States Supreme Court as justifying a limitation on parental authority. (*Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 234 [32 L.Ed.2d 15, 35].)

The therapeutic importance of granting due process to juveniles in commitment proceedings cannot be overlooked. Studies "suggest that the appearance as well as the actuality of fairness, impartiality and orderliness—in short, the essentials of due process—may be a more impressive and more therapeutic attitude so far as the juvenile is concerned." (*In re Gault, supra,* 387 U.S. 1, 26 [18 L.Ed.2d 527, 545].)

Neither the state, nor the parent, has an interest in committing a child to a state mental hospital for care and treatment if the child is not in need of treatment or if treatment can be provided without so drastically curtailing the freedom of the child. Recognition of the child's right to demand due process in the proceedings leading to commitment does not therefore impermissibly impinge on the parent's right to control the upbringing of his child.

Nor would such recognition of the child's right to due process in proceedings to admit him to a state mental hospital necessarily weaken the family unit. The contrary may be true. Rejecting a similar argument in *Planned Parenthood of Cent. Mo.* v. *Danforth, supra,* 428 U.S. 52 [49 L.Ed.2d 788, 96 S.Ct. 2831, 2844], the Supreme Court suggested that conditioning a minor's right to an abortion on parental consent by allowing the parent to overrule the minor's decision would not strengthen the family unit or enhance parental authority if the parent and the

minor are "so fundamentally in conflict." Here too, the parent and petitioner are in conflict, but here it is the minor who wishes to return to and the parent who would remove the minor from the family unit. A decision that petitioner is indeed in need of treatment for mental illness or disorder that can best be given in a hospital, fairly made after proceedings in which petitioner has been afforded due process, may well help him to accept the need for and thus be more receptive to treatment. If, on the other hand, it appears that the minor is not mentally ill or disordered, or that treatment can be given without removing him from the home, the family unit may be strengthened. Indeed, the Supreme Court has suggested that a court may have a duty to explore possible alternatives to the involuntary commitment of a juvenile, citing with apparent approval *Lake* v. *Cameron* (D.C.Cir. 1966) 364 F.2d 657 [124 App.D.C. 264], which arose in the context of a mentally ill adult. (*In re Gault, supra,* 387 U.S. 1, 28, fn. 41 [18 L.Ed.2d 527, 546].)

We conclude, therefore, that no interest of the state or of a parent sufficiently outweighs the liberty interest of a minor old enough to independently exercise his right to due process to permit the parent to deprive him of that right.

Inasmuch as petitioner is 14 years of age we need not consider whether there may be circumstances in which younger children may also be entitled to assert their right to due process independently when opposed to a parental decision to institutionalize the child. We are persuaded, however, that 14 years is the appropriate age at which such rights must be recognized. In affirming that minors have fundamental constitutional rights that the state must respect, the Supreme Court has also emphasized the responsibility of minors to respect their obligations to the state. (*Tinker* v. *Des Moines School Dist., supra,* 393 U.S. 503, 511 [21 L.Ed.2d 731, 740].) Traditionally, and modernly by statute, minors have been presumed competent to accept responsibility for criminal acts at age 14. (Pen. Code, § 26; *In re Gladys R.* (1970) 1 Cal.3d 855, 863-864 [83 Cal.Rptr. 671, 464 P.2d 127].) It would be anomalous indeed if they were not also presumed to have sufficient capacity to exercise due process rights at that age.[4]

---

[4]Increasing legislative recognition is also being accorded to the capacity of minors to participate intelligently in decisions affecting their lives. (See, e.g., § 700; Civ. Code, §§ 34.5, 34.6, 225, 4600; Prob. Code, § 1406.)

## The Demands of Due Process and Equal Protection

 Respondent contends that the existing procedures for "voluntary" admission of minors to state hospitals afford due process because no minor is admitted to a state hospital unless he has first been screened and referred by a local agency in accordance with section 5651, subdivision (f).[5] Respondent alleges that at Napa State Hospital this requirement is met when a designated "Community Mental Health Professional" screens the child to "insure that hospitalization is necessary" and ascertains if "appropriate" placement is available in the community, in which case no referral is made. Following a decision to refer a minor for hospitalization a representative of the Community Mental Health Clinic telephones a counterpart at the state hospital and relates the "clinical picture of the minor." If the staff at Napa State Hospital believes the minor is "appropriate for treatment in our program," more clinical material is requested and an admission date is arranged.

Respondent concedes that if the state admitted a child to a state mental hospital without "prior approval of a disinterested and competent third party" the procedure would be constitutionally suspect, but argues that the requirement of prior screening and referral by a community mental health professional only after determination that no community placement is available, and the review by state hospital personnel to assure that admission of the minor to the hospital program is "appropriate" fully satisfies the demands of due process.

Petitioner, on the other hand, claims not only that due process entitles him to all of the substantive and procedural rights extended to adults and minor wards of the court, but that failure to accord him equivalent rights denies him equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution and article I, section 7(b) of the California Constitution. The rights to which petitioner claims to be entitled are those accorded under the Lanterman-Petris-Short Act for evaluation and treatment of mentally disordered persons which we held in *In re Michael E., supra,* 15 Cal.3d 183, are

---

[5]Section 5650, a part of the Short-Doyle Act (§ 5600 et seq.) requires each county to submit annually to the director of health a plan for community mental hygiene services. Section 5651 specifies the matters to be included in the plan and provides following subdivision (f): "No mentally disordered person shall be admitted to a state hospital prior to screening and referral by an agency designated by the county Short-Doyle plan to provide this service."

applicable to juvenile court wards.[6] He would include the substantive right not to be involuntarily hospitalized without a determination that he is gravely disabled[7] or dangerous to himself or others as a result of mental disorder,[8] and the procedural rights to counsel, to notice and judicial hearing, to confrontation and cross-examination, to present evidence on his own behalf, and to a jury trial.

 We do not agree that equal protection precludes involuntary placement of mentally ill minors in state operated mental hygiene facilities if the minors are neither gravely disabled nor dangerous to themselves or others. The liberty interest of an adult may sufficiently outweigh the state's interest in promoting optimal mental health that the state may not confine a nondangerous adult solely for the purpose of treating that person's mental illness. Clearly the state may not involuntarily confine a harmless mentally ill individual without providing treatment. (*O'Connor* v. *Donaldson, supra,* 422 U.S. 563, 576 [45 L.Ed.2d 396, 407].) Whether or not it might constitutionally do so, the Legislature

[6]Petitioner claims also that since wards have now been given the right to voluntarily commit themselves (§ 6552) equal protection requires that nonwards have the same option. Since petitioner has never attempted to assert or been denied that right, since he denies that he suffers from a mental disorder, and he asserts that he is entitled to be released from the state hospital because he is not in need of and does not wish to receive treatment there, we need not consider this claim.

[7]"Gravely disabled" in the present context is defined in subdivision (h)(1) of section 5008.

"(h) For purposes of Article 1 (commencing with Section 5150), Article 2 (commencing with Section 5200), and Article 4 (commencing with Section 5250) of Chapter 2 of this part, and for the purposes of Chapter 3 (commencing with Section 5350) of this part, "gravely disabled" means:

"(1) A condition in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs for food, clothing, or shelter; . . .

"A person of any age may be 'gravely disabled' under this definition, but the term does not include mentally retarded persons." (See also *In re Gonzales* (1971) 6 Cal.3d 346, 351 [99 Cal.Rptr. 17, 491 P.2d 809].)

[8]Section 5300 permits certification of an "imminently dangerous" person for 90-day periods of treatment if after 14 days of intensive treatment the person:

"(a) Has threatened, attempted, or inflicted physical harm upon the person of another after having been taken into custody for evaluation and treatment, and who, as a result of mental disorder, presents an imminent threat of substantial physical harm to others, or

"(b) Had attempted or inflicted physical harm upon the person of another, that act having resulted in his being taken into custody and who presents, as a result of mental disorder, an imminent threat of substantial physical harm to others.

"For purposes of this article 'custody' shall be construed to mean involuntary detainment under the provisions of this part uninterrupted by any period of unconditioned release from a facility providing involuntary care and treatment."

Suicidal persons may not be detained involuntarily for treatment beyond 14 days unless they are subject to commitment under section 5300 or are the object of conservatorship proceedings for the "gravely disabled" under section 5350 et seq. (§ 5264.)

has not permitted involuntary confinement of harmless mentally ill adults or juvenile court wards in state mental hospitals unless they are gravely disabled. It does not follow, however, that a nondangerous minor is denied equal protection if his parent is permitted to obtain treatment for the minor's mental illness or disorder by such placement for "[t]he Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." (*Tigner* v. *Texas* (1940) 310 U.S. 141, 147 [84 L.Ed. 1124, 1128, 60 S.Ct. 879, 130 A.L.R. 1321]; see also *Estelle* v. *Dorrough* (1975) 420 U.S. 534, 538-539 [43 L.Ed.2d 377, 381-382, 95 S.Ct. 1173].)

■ The liberty interest of a minor is qualitatively different than that of an adult, being subject both to reasonable regulation by the state to an extent not permissible with adults (*Planned Parenthood of Cent. Mo.* v. *Danforth, supra,* 428 U.S. 52, 74 [49 L.Ed.2d 788, 808, 96 S.Ct. 2831, 2843]; *Ginsberg* v. *New York, supra,* 390 U.S. 629, 638 [20 L.Ed.2d 195, 203]; *Prince* v. *Massachusetts, supra,* 321 U.S. 158, 170 [88 L.Ed. 645, 654-655]), and to an even greater extent to the control of the minor's parents unless "it appears that the parental decisions will jeopardize the health or safety of the child or have a potential for significant social burdens." (*Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 234 [32 L.Ed.2d 15, 35].) Minors in the circumstances of petitioner, therefore, are not "similarly situated" with adults for purposes of equal protection analysis. When, as here, a parent seeks to exercise the parent's right to direct his child's upbringing, a right which we have recognized as "a compelling one, ranked among the most basic of civil rights" (*In re B. G.* (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244]) by obtaining for the child treatment that the parent believes to be advisable, the parent is not precluded from obtaining that treatment at a state hospital simply because it might be available elsewhere or because the state could not force an adult to accept the same treatment. Were that the rule, not only would some minors be denied treatment if the parents were unable to afford private care of a similar kind, but the parent would be denied the right to choose the type of care the child would receive even though the parent "may have a better understanding of the best interests of his child than does the juvenile court." (*Id.,* at p. 694.)

■ Finally, admissions such as that of petitioner are distinguishable from those of court wards because although the state is necessarily involved, the placement of the child in the hospital is initiated by the parent. No right is denied these minors by permitting their admission to state hospitals by their parents even though nondangerous court wards

could not be committed unless mentally retarded or gravely disabled (see *In re Michael E., supra,* 15 Cal.3d 183, 193, fn. 14; *In re L. L.* (1974) 39 Cal.App.3d 205 [114 Cal.Rptr. 11]). As to both classes of minors the state has the same interest—that they mature into healthy adults capable of full participation in society. By providing care in state hospitals, the state has made treatment available to nondangerous mentally ill children for whom adequate care is not available in the community either because the local community does not have a comparable closed treatment facility or because the parent cannot afford the expense of care in such a facility. Both public and private closed facilities other than state hospitals are available to the juvenile court, however, and wards may be placed in these facilities and given psychiatric treatment at public expense. (§§ 739, subd. (c), 888, 900; *In re Aline D.* (1975) 14 Cal.3d 557, 566-567 [121 Cal.Rptr. 816, 536 P.2d 65].) That one class of minors is compelled by factors unrelated to state action to receive treatment in a state hospital while another receives it in a county facility or closed private school or hospital does not in our view deny equal protection to either class. (See *Reed* v. *Reed* (1971) 404 U.S. 71, 75-76 [30 L.Ed.2d 225, 229-230, 92 S.Ct. 251]; *Barbier* v. *Connolly* (1885) 113 U.S. 27, 32 [28 L.Ed. 923, 925, 5 S.Ct. 357].)

▇ The question remains whether petitioner has been afforded due process. We do not accept either petitioner's suggestion that all of the procedures required by the Lanterman-Petris-Short Act are mandated by due process or respondent's assertion that the procedures presently being followed satisfy constitutional requirements. ▇ Due process forbids the arbitrary deprivation of liberty (*Goss* v. *Lopez, supra,* 419 U.S. 565, 574 [42 L.Ed.2d 725, 734-735]) and, in the context of commitment to a mental hospital requires at least "that the nature and duration of commitment bear some reasonable relation to the purpose for which the individual is committed." (*Jackson* v. *Indiana* (1972) 406 U.S. 715, 738 [32 L.Ed.2d 435, 451, 92 S.Ct. 1845].) Thus, the focus of our attention must be to delineate procedures that will ensure the child a fair opportunity to establish that (1) he is not mentally ill or disordered, or that, (2) even if he is, confinement in a state mental hospital is unnecessary to protect him or others and might harm rather than improve his condition. Procedures designed to establish these facts are necessary to accommodate both the parent's right to control his child's development and the state's interest in limiting parental control when parental action may harm the physical or mental health of the child. (*Wisconsin* v. *Yoder, supra,* 406 U.S. 205, 230 [32 L.Ed.2d 15, 33]; *Stanley* v. *Illinois* (1972) 405 U.S. 645, 650-651 [31 L.Ed.2d 551, 558, 92 S.Ct.

1208].) We emphasize here our assumption that the great majority of parents are well motivated and act in what they reasonably perceive to be the best interest of their children. That fact cannot, however, detract in any way from the child's right to procedures that will protect him from arbitrary curtailment of his liberty interest in such a drastic manner no matter how well motivated.

That the present screening procedure does not offer an adequate forum in which to resolve either the disputed questions of fact, upon which the psychiatric diagnosis of mental illness or disorder may rest in part, or conflicting medical opinions as to whether the minor is mentally ill or disordered and in need of the treatment to be provided by the state hospital is forcefully illustrated by the instant case. Respondent asserts that petitioner is in the "borderline defective category" and is presently diagnosed as suffering from latent schizophrenia for which he is receiving an antipsychotic drug. The diagnosis is based in part on a history which accompanied him at the time of admission. The history recited that petitioner had been verbally and physically aggressive toward his mother, had threatened suicide, and had threatened to jump off a roof. Respondent admits, however, that petitioner has "maintained for several months without aggressive, destructive acts," and "is not gaining from further hospitalization."

Petitioner, on the other hand, denies that he is psychotic, that he suffers from a latent form of schizophrenia, that he has a history of aggressive behavior, or that he has threatened harm to himself or others. In support of his claim that he is not mentally ill or disordered and is not in need of and will not benefit from the treatment program of the hospital, he alleges that after a preadmission evaluation at the Gladman Memorial Hospital a physician concluded that petitioner is "clearly not psychotic," while a psychologist concluded that he was not only not psychotic, but was "a vulnerable youngster who has most of his energy focused on his own self protection." Two other physicians from the same facility recommended that petitioner not be confined by a placement such as that at a juvenile hall since he "cannot tolerate physical restraint and needs space."

Notwithstanding these conflicting diagnoses and evaluations of petitioner's needs he was admitted to the Napa State Hospital where he has allegedly been confined in a complex which has barred windows and locked doors in an open ward with 40 other minors some of whom are so severely disturbed that they are unable to dress themselves. He alleges

that he has been approached sexually by other boys whose advances he has repelled, and he fears further such advances. While he has been hospitalized two other minors have attempted suicide.

In light of the drastic invasion of the minor's right to personal liberty and the potential damage that may accompany an erroneous diagnosis and placement of a minor child in a mental hospital, the failure to accord petitioner an opportunity for a precommitment hearing before a neutral factfinder cannot be justified. Respondent's suggestion that the postadmission evaluation by the hospital staff is adequate to avoid misdiagnosis ignores both the diametrically opposed views to which precommitment and postadmission evaluation led in the instant case, and the fact that neither postadmission evaluation or even a postadmission hearing would afford the minor the benefit of a hearing in the community where his witnesses would be readily available and alternative resources better understood. (Cf. *Morrissey* v. *Brewer, supra,* 408 U.S. 471, 485 [33 L.Ed.2d 484, 496].) Clearly, postadmission procedures would be inadequate to avoid the trauma of removal of the child from the home and unnecessary placement in a mental hospital.[9] The Supreme Court has described as a "root requirement" of due process the obligation to give an individual "an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (*Boddie* v. *Connecticut* (1971) 401 U.S. 371, 379 [28 L.Ed.2d 113, 119, 91 S.Ct. 780], italics in original. See also, *Fuentes* v. *Shevin* (1972) 407 U.S. 67, 82 [32 L.Ed.2d 556, 570-571, 92 S.Ct. 1983].) Surely, the individual's interest in personal liberty can be accorded no less protection.

When the state participates in deprivation of a person's right to personal liberty, even a conditional liberty, due process requires that the facts justifying that action be reliably established. To that end the United States Supreme Court has suggested that, at a minimum, due process requires that the person receive a hearing after adequate written notice of the basis for the proposed action; an opportunity to appear in person and to present evidence in his own behalf; the right to confrontation by,

---

[9]Not to be overlooked is the possibility that a full hearing prior to a decision to admit a minor to a state hospital will reveal that the parent or parents seeking the admission are a contributing factor in the child's problem, that treatment of the child will be effective only if the family is counseled together, or that placement outside the home in foster care or a less restrictive environment than that of the hospital will better serve the minor's needs. (See Ellis, *Volunteering Children: Parental Commitment of Minors to Mental Institutions* (1974) 62 Cal.L.Rev. 840, 859-862.)

and the opportunity to cross-examine, adverse witnesses; a neutral and detached decision maker; findings by a preponderance of the evidence; and a record of the proceeding adequate to permit meaningful judicial or appellate review. (Cf. *Morrissey* v. *Brewer, supra,* 408 U.S. 471, 489 [33 L.Ed.2d 484, 499]; *In re Gault, supra,* 387 U.S. 1.) Inasmuch as a minor may be presumed to lack the ability to marshal the facts and evidence, to effectively speak for himself and to call and examine witnesses, or to discover and propose alternative treatment programs, due process also requires that counsel be provided for the minor. (Cf. *Gagnon* v. *Scarpelli* (1973) 411 U.S. 778, 790-791 [36 L.Ed.2d 656, 666-667, 93 S.Ct. 1756]; *In re Gault, supra,* 387 U.S. 1, 36 [18 L.Ed.2d 527, 551]; *Gee* v. *Brown* (1975) 14 Cal.3d 571 [122 Cal.Rptr. 231, 536 P.2d 1017]; *In re Ricky H.* (1970) 2 Cal.3d 513 [86 Cal.Rptr. 76, 468 P.2d 204].)[10]

We do not accept petitioner's suggestion that he is entitled to a jury trial and a judicial hearing. Minors do not have a constitutional right to a jury trial in juvenile proceedings, even those which have penal overtones. (*People* v. *Superior Court (Carl W.)* (1975) 15 Cal.3d 271, 274 [124 Cal.Rptr. 47, 539 P.2d 807]; *McKeiver* v. *Pennsylvania* (1971) 403 U.S. 528 [29 L.Ed.2d 647, 91 S.Ct. 1976].) It follows that minors do not have any greater right in purely civil commitment proceedings. Although the Legislature has extended a statutory right to a jury trial in those commitments which are undertaken pursuant to the Lanterman-Petris-Short Act, equal protection does not require identical procedures. As we have heretofore noted, the minor whose hospital admission is sought by parents who retain the right to control their child's upbringing, including the type and extent of medical and/or psychiatric treatment the child shall receive is not similarly situated with the class of minors who have been adjudicated wards or dependent children of the court. Since the jury is not a necessary component of accurate factfinding (*McKeiver* v. *Pennsylvania, supra,* 403 U.S. 528, 543 [29 L.Ed.2d 647, 659-660]), absent some basis upon which to conclude that a neutral judge or hearing officer will not offer a decision making process substantially

---

[10]A minor may, of course, waive any of these rights and acquiesce in the parent's decision to place him in a state hospital for treatment, thus achieving what is in practical effect a "voluntary" admission. To be truly voluntary and intelligent in a constitutional sense such a waiver should be made only if the minor is aware of his rights and the consequences of the waiver, including the nature of the commitment, its probable duration, and the treatment regimen. It has been suggested that a waiver by a minor should not be accepted unless accompanied by a certificate of his counsel attesting that the attorney has consulted with the minor about the proposed commitment, explained his right to protest it, described possible alternatives and ascertained that the minor wished to enter the hospital without a hearing. (See Ellis, *supra,* fn. 9, at p. 906.)

equivalent to a jury trial, neither due process nor equal protection requires that this decision be by jury.

For similar reasons we decline to hold that due process or equal protection mandates a judicial hearing. Although the informal atmosphere that can be achieved in a juvenile court may suggest that court as an appropriate forum, a judicial hearing is not constitutionally compelled. We are cognizant that when personal liberty is at stake and institutionalization the object of the proceeding, a judicial hearing is the norm. (See, e.g., *Jackson* v. *Indiana, supra,* 406 U.S. 715; *In re Gault, supra,* 387 U.S. 1; *Baxstrom* v. *Herold* (1966) 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760].) We recognize, too, that due process requires a judicial hearing whenever the *state* seeks to deprive an adult of his liberty by committing him to a mental hospital. When the parent who already has the right and obligation to control a child's personal liberty seeks, in the exercise of that right, to place the child in a mental hospital, however, an administrative hearing may be adequate to satisfy due process.

The United States Supreme Court has upheld administrative hearings when the state, which already has custody, seeks to curtail the conditional liberty interest of a parolee or probationer. (*Morrissey* v. *Brewer, supra,* 408 U.S. 471; *Gagnon* v. *Scarpelli, supra,* 411 U.S. 778.) We conclude therefore that due process does not require that the hearing be conducted by a judge. ■ By analogy, we also conclude that because the proceedings to admit a mentally ill or disordered minor to a state hospital are within the parental right to custody and control of his child, whereas the rights of the child and the interest of the state are limited to preventing hospitalization that because unnecessary or potentially ineffective may be harmful to the physical or mental health of the child, the reasonable doubt standard of proof is inapplicable. (Cf. *In re Arthur N., supra,* 16 Cal.3d 226.) The lesser standard of proof by a preponderance of the evidence which is applicable to dependency proceedings (§ 701), and the dispositional phase of delinquency proceedings (*In re Winship, supra,* 397 U.S. 358, 366 [25 L.Ed.2d 368, 376-377]) will also satisfy due process in hearings on a parent's application to admit a minor child to a state hospital.

■ Our holding that procedures established by the Department of Health to implement the authorization of section 6000, subdivision (b), for admission of minors to state hospitals denies minors 14 years of age and older due process does not require the release of all such minors now

confined in state hospitals.[11] They have been placed there by parents whom we presume have acted in the best interests of their children. Their judgment has been ratified by both the local community mental health professional and by the medical staff of the hospital. A precipitous release of these children to families and community facilities unprepared to care for them could be both disruptive to the treatment program and potentially harmful to the child and the community. They are, however, entitled to a hearing, if they so request, on the propriety of their continued confinement.

Those minors 14 years of age or older now confined in state hospitals under voluntary admissions pursuant to section 6000, subdivision (b), may therefore seek relief by petition for writ of habeas corpus,[12] alleging that they are not mentally ill or disordered, or that, even if they are mentally ill, they are not gravely disabled or dangerous and the treatment for which they are confined is not reasonably likely to be beneficial. If the petition states such a prima facie case, an order to show cause should issue, and a hearing should be held. If the court finds, after the hearing, that the minor is not mentally ill or disordered, he must be released. If the court finds that the minor is mentally ill or disordered but is not gravely disabled or dangerous to himself or others, the minor is entitled to his release only if the court also finds that treatment in the state hospital is not reasonably likely to be of benefit to him.

Petitioner unsuccessfully sought relief by petition to the superior court of the county in which he is confined but no hearing has been held to determine whether a basis exists for his continued confinement. The superior court is the appropriate forum in which to adjudicate disputed issues of fact. No writ having issued on his last application to the superior court, petitioner is not precluded from again seeking relief by petition to that court. (Pen. Code, § 1475.)

---

[11]Although minors 14 years of age and older may no longer be admitted under section 6000, subdivision (b), absent a voluntary and intelligent waiver of their rights as outlined above, we anticipate that the Legislature will adopt legislation to assure due process to minors whose parents apply for their admission. In the interim commitment under the Lanterman-Petris-Short Act is available to assure treatment and confinement of those minors whose condition is such that they are gravely disabled or dangerous to themselves or to others.

[12]We anticipate that, as in the instant case, the public defender of the county of the minor's residence, and/or the state public defender, will identify and assist those minors who may be entitled to release in the preparation and filing of these petitions.

The order to show cause is therefore discharged and the petition denied without prejudice to a renewed application for relief in the superior court.

Tobriner, Acting C. J., Mosk, J., and Sullivan, J.,* concurred.

**CLARK, J.,** Dissenting.—

I

We have witnessed greater expansion of procedural due process in the last 7 years than in the previous 180-year period following ratification of the Fifth Amendment to the United States Constitution. (Friendly, *"Some Kind of Hearing"* (1975) 123 U.Pa.L.Rev. 1267, 1273.) As this expansion has occurred, the response in one area after another has been to say, "If there, why not here?" Indeed, now that the United States Supreme Court has held that a child must be given "oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story" before he may be temporarily suspended from school (*Goss* v. *Lopez* (1975) 419· U.S. 565, 581 [42 L.Ed.2d 725, 739, 95 S.Ct. 729]), it is probably too late in the day to argue that a child does not have the right to a "due process hearing" before being committed to a mental institution.

However, granting that Roger is entitled to due process, the question remains, in the now hackneyed formula, "What process is due?" (*Morrissey* v. *Brewer* (1972) 408 U.S. 471, 481 [33 L.Ed.2d 484, 494, 92 S.Ct. 2593].) Unlike the majority, I do not believe that due process requires trial-type procedure here. To the contrary, I am convinced that the present system could with very little modification meet appropriate standards.

Due process does, as the majority contend, require that the hearing be held before a "neutral factfinder." However, contrary to the majority's assumption, this requirement does not narrow the list of eligibles to judges and administrative hearing officers. In *Goldberg* v. *Kelly* (1970) 397 U.S. 254 [25 L.Ed.2d 287, 90 S.Ct. 1011], the high court "pointedly did not require that the hearing on termination of [welfare] benefits be

---

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairman of the Judicial Council.

conducted by a judicial officer or even before the traditional 'neutral and detached' officer; it required only that the hearing be conducted by some person *other* than one initially dealing with the case." (*Morrissey* v. *Brewer, supra,* 408 U.S. 471, 486 [33 L.Ed.2d 484, 497].) Accordingly, the court held in *Morrissey* that in the parole revocation context due process would be satisfied if the prerevocation hearing were held by a parole officer not previously involved in the case and if the revocation hearing were held by the parole board. (408 U.S. at pp. 486, 489 [33 L.Ed.2d at pp. 497-499]; see *Wolff* v. *McDonnell* (1974) 418 U.S. 539, 570-571 [41 L.Ed.2d 935, 959, 94 S.Ct. 2963] [prison officials may conduct hearing on disciplinary infraction which may result in loss of "good time" credit].)

The present system was established by legislative and executive action. It is not our prerogative to insist on greater changes in the system than are constitutionally required. Therefore, we should uphold existing procedure by recognizing that the mental health professionals on the hospital staff qualify as "neutral factfinders." Aside from the fact that a hearing by hospital staff would occur after admission, a point discussed below, the majority's only objection to such a hearing is that "the diametrically opposed views to which precommitment and postadmission evaluation led in the instant case" allegedly demonstrate that "evaluation by the hospital staff is [not] adequate to avoid misdiagnosis." (*Ante,* p. 937.) This argument, of course, proves too much. When a case is heard by the superior court, Court of Appeal, this court and the United States Supreme Court, the 20 judges may be evenly divided on the applicable principles of law. But that would not demonstrate their incompetence. The judicial robe is not a magic cloak. It should be obvious—but apparently it is not—that neither judges nor administrative hearing officers are better qualified than psychiatrists to render psychiatric judgments. (Cf. *In re Bye* (1974) 12 Cal.3d 96, 107 [115 Cal.Rptr. 382, 524 P.2d 854] ("[A] revocation decision in a civil addict program is often a medical one and as such is necessarily less subject to objective scrutiny by a lay hearing officer.").)

As to timing, due process does not require that the hearing be held prior to the minor's admission to the hospital. The majority quote the statement in *Boddie* v. *Connecticut* (1971) 401 U.S. 371, 379 [28 L.Ed.2d 113, 119, 91 S.Ct. 780], that due process requires a person be given " 'an opportunity for a hearing *before* he is deprived of any significant property interest, except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event.' " (*Ante,* p. 937.) Upon reading this quotation one is

inclined to conclude, as the majority urge, "Surely, the individual's interest in personal liberty can be accorded no less protection." (*Ante*, p. 937.) However, one then recalls that in parole revocation proceedings due process is satisfied if the hearings, even the so-called "prerevocation" hearing, are held *after* the parolee has been deprived of his conditional liberty. As this court stated in *People* v. *Vickers* (1972) 8 Cal.3d 451, 460 [105 Cal.Rptr. 305, 503 P.2d 1313], "[W]e read *Morrissey* as applicable only in those instances where an actual seizure of the individual has occurred. It is this loss of liberty which compels the procedures set forth in *Morrissey.*" A child's interest in liberty is qualified for very different reasons than is a parolee's, but it is qualified, nevertheless, as the majority recognize. (*Ante*, p. 934.)

Moreover, even assuming that *Boddie* states the applicable rule, this case comes within the declared exception. Roger's life may have been at stake. He had allegedly threatened to kill himself. Surely the state had a sufficient interest in preventing this disturbed youngster from taking his own life to justify postponing the hearing until he had been admitted to the hospital and helped through this crisis. The safeguards against abuse built into existing procedure are ample. Roger's mother, who presumptively has his best interests at heart, initiated admission proceedings and a community mental health professional, after consultation with hospital staff, concluded that Roger was in need of treatment that could not be provided within the community.

Finally, due process does not require that the minor be represented by counsel. It is popularly held "Under our adversary system the role of counsel is not to make sure the truth is ascertained but to advance his client's cause by any ethical means. Within the limits of professional propriety, causing delay and sowing confusion not only are his right but may be his duty." (Friendly, "*Some Kind of Hearing*" (1975) 123 U.Pa.L.Rev. 1267, 1288; see Frankel, *The Search for Truth: An Umpireal View* (1975) 123 U.Pa.L.Rev. 1031.) In *Wolff* v. *McDonnell* (1974) 418 U.S. 539 [41 L.Ed.2d 935, 94 S.Ct. 2963], the high court recognized in the prison context that "[t]he insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals." (418 U.S. at p. 570 [41 L.Ed.2d at p. 959].) The court thus declined to hold that inmates had a right either to appointed or even to retained counsel, instead indicating that where an illiterate inmate was involved, or where the issues were sufficiently complex to make the inmate unable "to collect and present the evidence necessary for an adequate comprehen-

sion of the case," he should be permitted to seek the aid of fellow prisoners, or if that is prohibited, to have "adequate substitute aid in the form of help from the staff or from a sufficiently competent inmate designated by the staff." (*Id.*) As the questions presented in this proceeding do not involve guilt or innocence, but necessity and availability of treatment, the youngster should be assisted not by a lawyer but by a mental health professional from his own community having ready access to witnesses and familiarity with community resources.

The judiciary is developing a messianic image of itself. It is coming to believe that salvation for society's ills lies in adversary hearings. I cannot subscribe to that view.

## II

Resting the decision in this case upon both the state and the federal Constitutions is inconsistent with our stated policy that "we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." (*People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000]; see *People* v. *Gilbert* (1969) 1 Cal.3d 475, 481, 484-485 [82 Cal.Rptr. 724, 462 P.2d 580]; *Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 65-66 [195 P.2d 1]; *Estate of Johnson* (1903) 139 Cal. 532, 534 [73 P. 424].) Clearly, we are not required to reach federal constitutional questions to dispose of this matter if, as the majority hold, the state Constitution accords petitioner the very rights which he asserts have been denied him. Holding that current state procedure for admission of minors to state hospitals denies minors 14 years of age and older due process under article I, section 7(a) of the California Constitution should end the matter; there is no continuing actionable state conduct to be examined under the federal due process clause.

Professor Hans Linde argues that when the constitutionality of state action is challenged in state court under both state and federal constitutions and the action is nullified on the basis of the state constitution, it is not only unnecessary but "illogical" to proceed to the federal constitutional question. "The state constitution is part of the state law, and decisions applying it are part of the total state action in a case. When the state court holds that a given state law, regulation, ordinance, or official action is invalid and must be set aside under the state constitution, then the state is not violating the fourteenth amendment.

"The point is obvious when a conclusion such as 'Regulation X denies defendant's rights under the fourteenth amendment and the corresponding section of [the state constitution]' is broken down into its component parts. When a judgment holds with the defendant that the regulation is invalid under the state constitution, it cannot move on to a second proposition invalidating the state's action under the federal Constitution. By the action of the state court under the state constitution, the state has accorded the claimant the due process and equal protection commanded by the fourteenth amendment, not denied it. While a defendant may have both a state and a federal constitutional claim to present, legally these are not cumulative but alternative: 'If this official action is not forbidden by the state constitution, as I claim it is, then the state denies me a federal right.'" (Linde, *Without "Due Process"—Unconstitutional Law in Oregon* (1970) 49 Ore.L.Rev. 125, 133-134.)

Alternatively, it has been argued that when state action is challenged as violative of both state law and the United States Constitution, a state court should first address the federal constitutional question, and if it be resolved against the state, inquire no further. "As the [federal Constitution] expressly prohibits the described state of conduct, we need not inquire further and to do so only emphasizes matters which should be of no concern to us. [¶] There is no stronger statement of governing policy considerations in any particular circumstance than an express declaration embodied in our federal Constitution. Where, as here, such a declaration is manifestly dispositive of the single issue, no good purpose is served by a concurrent examination of state or federal policies, or legislative histories, in an attempt to ascertain that the supreme law of the land must be adhered to because lesser policy considerations likewise require the same result." (*Jolicoeur* v. *Mihaly* (1971) 5 Cal.3d 565, 583 [96 Cal.Rptr. 697, 488 P.2d 1] (Wright, C. J., concurring).)

However, the majority's failure even to pay lip service to our policy against reaching constitutional issues "unless absolutely required to do so to dispose of the matter before us" is the lesser of their derelictions. A matter of greater concern is that by relying on both the state and federal Constitutions this court, in effect, prevents any other institution, state or federal, from reconsidering the issues presented by this case. By invoking the state Constitution this court insulates itself from review by the United States Supreme Court. (See *Jankovich* v. *Toll Road Comm'n.* (1965) 379 U.S. 487, 491-492 [13 L.Ed.2d 439, 442-443, 85 S.Ct. 493]; *Herb* v. *Pitcairn* (1945) 324 U.S. 117, 125-128 [89 L.Ed. 789, 794-796, 65 S.Ct. 459]; see also *Gee* v. *Brown* (1975) 14 Cal.3d 571, 576-577 [122 Cal.Rptr.

231, 536 P.2d 1017] (Clark, J., dissenting).) By resting its decision on the federal Constitution as well this court severely inhibits political review through the legislative or initiative process. No court should presume that it is so immune from error that it may foreclose every means of challenging its decisions.

"Decisions based on independent state and federal grounds may substantially discourage any effort to use the state political process to change the relevant state law, because amendment to the state constitution or laws cannot correct the federal defect and therefore cannot change the result of the state court's decision. Of course, the citizens or the legislature may proceed with an amendment to the state laws with the notion that another court test involving only the federal question can be instituted once the state law is changed. But it would seem to require a very high degree of organization and commitment to achieve political reform in such circumstances; rather than changing the effect of the state court decision, all reform of state law will accomplish is a 'clear deck' upon which a new law suit may be brought. The presence of the federal ground will therefore produce an insulation from the political process beyond that which a state court would otherwise enjoy when it interprets the provision of state law in a fashion unsatisfactory to a substantial portion of the state's citizens. . . . [¶] If a state court bases a decision on independent state and federal grounds to gain this 'insulation effect,' its action is illegitimate. Such action uses the limitations of the power of federal courts in the federal system to increase the state court's decision-making power vis-a-vis other branches of state government, perhaps beyond the effective control of even a super-majority of the state's citizens." (Bice, *Anderson and the Adequate State Ground* (1972) 45 So.Cal.L.Rev. 750, 757-758.)

As the Attorney General observed, "Not only does the invocation of both constitutions to end review betray a distrust of other institutions, it is also shortsighted. Possessed of neither the purse nor the sword, the power and influence of this Court are in direct proportion to the respect which its decisions command. Decisions which this Court renders unreviewable will undermine public trust and confidence in the long run."

Moreover, this court has been unpredictable in determining whether to base a decision on the state or the federal Constitution, or both. Decisions involving search and seizure claims now routinely cite both charters. (See, e.g., *People* v. *Ramey* (1976) 16 Cal.3d 263, 268 [127

Cal.Rptr. 629, 545 P.2d 1333]; *People* v. *Scott* (1976) 16 Cal.3d 242, 250 [128 Cal.Rptr. 39, 546 P.2d 327].) By contrast, one significant equal protection decision relied solely on the United States Constitution. (*Bakke* v. *Regents of University of California* (1976) 18 Cal.3d 34, 38, 63 [132 Cal.Rptr. 680, 553 P.2d 1152], cert. granted, 429 U.S. 1090 [51 L.Ed.2d 535, 97 S.Ct. 1098].) This uncertainty makes constitutional litigation difficult for the parties, who can only guess which constitutional document will be interpreted. One commentator has decried this court's failure to apply the independent state ground doctrine in a "principled fashion." (*The Supreme Court of California 1975-1976: Criminal Procedure: Impeachment with Constitutionally Infirm Evidence* (1977) 65 Cal.L.Rev. 393, 405; see also Note, *The New Federalism: Toward a Principled Interpretation of the State Constitution* (1977) 29 Stan.L.Rev. 297.) The point is well taken. This unpredictability reveals an absence of principle.

**RICHARDSON, J.,** Concurring and Dissenting.—I concur in the judgment, on the basis that petitioner's commitment was unlawful as a denial of procedural due process and equal protection of the laws under the Fourteenth Amendment to the United States Constitution. I respectfully dissent, however, from that portion of the majority's opinion wherein it relies on *both* the United States Constitution and the California Constitution. For reasons expressed by Justice Clark in his dissenting opinion herein, and by me in *People* v. *Disbrow* (1976) 16 Cal.3d 101, 118-121 [127 Cal.Rptr. 360, 545 P.2d 272] (dis. opn.), I do not agree with the court's reliance upon substantially identical language in both Constitutions, thereby insulating our decisions both from review by the United States Supreme Court and from change through the legislative or initiative process.

The petitions of both parties for a rehearing were denied September 15, 1977; the dissenting opinion was modified to read as printed above; and a concurring and dissenting opinion by Richardson, J., was filed.