[Civ. No. 19769. Fourth Dist., Div. Two. Aug. 22, 1978.]

*NORTH LOS ANGELES COUNTY REGIONAL CENTER,
Petitioner and Respondent, v.
DEAN JARAKIAN, Objector and Appellant.

*Reporter's Note: This case was previously entitled "In re Jarakian."

**COUNSEL**

Charles E. Ward, Public Defender, Littleton M. Gunn and Andrew E. Rubin, Deputy Public Defenders, for Objector and Appellant.

Alan K. Marks, County Counsel, and Dawn Stafford, Deputy County Counsel, for Petitioner and Respondent.

**OPINION**

**MORRIS, J.**—Dean Jarakian, a developmentally disabled person, who was a patient in Patton State Hospital at the time these proceedings were commenced, appeals from an order of the superior court committing him to the State Department of Health for suitable care and treatment pursuant to Welfare and Institutions Code section 6514.[1] Appellant

[1]These proceedings were originally commenced by a petition pursuant to former Health and Safety Code section 38009.1. (See Stats. 1976, ch. 1364, § 2, pp. 6211-6212.) Health and Safety Code sections 38009.1 and 38009.2 were subsequently repealed and the provisions for such commitments transferred to Welfare and Institutions Code sections 6513 and 6514. (See Stats. 1977, ch. 984, §§ 1-4, No. 4 Deering's Adv.Legis.Service, p. 214;

attacks his commitment on numerous grounds as follows: (1) the statute under which he was committed is unconstitutionally vague (i.e., it fails to give fair warning of the conduct proscribed by law), (2) the statute is overbroad so as to authorize punishment for status, (3) the statutory procedure under which developmentally disabled persons who are residents of a state hospital may be committed denies such persons equal protection of the laws in violation of their federal and state constitutional rights, and (4) prior to commitment such persons are entitled to a hearing on "the least restrictive placement" by both statutory and constitutional mandate.

Because we conclude that the statutory procedure under which appellant was committed violates the equal protection provisions of the state and federal Constitutions (Cal. Const., art. I, § 7, art. IV, § 16; U.S. Const., 14th Amend.), it is unnecessary for us to consider appellant's remaining contentions.

Before considering the factual setting or the respective contentions of the parties, we find it appropriate to examine the statutory scheme pertaining to the commitment of developmentally disabled persons. There are three provisions in the codes creating at least two categories of developmentally disabled persons to which two different standards for commitment are applied.

Sections 6513 and 6514 of the Welfare and Institutions Code apply only to developmentally disabled persons residing in a state hospital who have not been judicially committed.[2] Under the procedure established under these sections, any developmentally disabled person who has not been judicially committed may leave the hospital upon request and after completion of discharge procedures unless, in the opinion of the chief clinical director of the hospital, immediate release of the resident may result in serious personal harm to the resident. In such case the hospital discharge procedure may require assessment by a

*Children's Hosp. of Los Angeles* v. *Superior Court* (1977) 74 Cal.App.3d 445 [141 Cal.Rptr. 515].) Welfare and Institutions Code sections 6513 and 6514 are repealed by Statutes of 1977, chapter 984, section 12, No. 4, Deering's Advance Legislative Service, page 220, on January 1, 1979.

[2]Any developmentally disabled person residing in a state hospital who has not been judicially committed is considered a "nonprotesting" resident or, if the person has given informed consent to his admission, a "voluntary" resident. (Welf. & Inst. Code, § 6513.)

regional center.[3] For those persons found by the regional center to be in continued need of state hospital care, the regional center shall either readmit such persons as voluntary residents of the state hospital or request the district attorney or county counsel to file a petition in superior court seeking commitment to the State Department of Health. In the event such a petition is filed, "if the court finds that the person is developmentally disabled and that he is not capable of providing for his basic personal needs for food, clothing, and shelter, and is not able to protect himself from ordinary threats to life, health, or safety, and is not willing to accept suitable care and treatment on a voluntary basis, the person may be committed to the State Department of Health for suitable care and treatment." (§ 6514.) Thus the standard for commitment of a developmentally disabled voluntary or nonprotesting resident of a state hospital is inability to provide for his basic needs for food, clothing, and shelter, and inability to protect himself from ordinary threats to life, health, or safety.

A different standard for commitment is provided for developmentally disabled persons who are not already residents of a state hospital. This occurs under two statutory provisions.

Developmental disability as defined by statute includes mental retardation.[4] In fact, if one is found to be a "mentally retarded person" as defined by statute, it would be logically impossible not to find that such person is also developmentally disabled.[5] Nevertheless, no mentally

---

[3]The provisions for regional centers are contained in Welfare and Institutions Code section 4620 et seq., formerly Health and Safety Code section 38200 et seq.

All statutory references are to the Welfare and Institutions Code unless indicated otherwise.

[4]Section 4512, subdivision (a), (formerly Health & Saf. Code, § 38010) provides: " 'Developmental disability' means a disability which originates before an individual attains age 18, continues, or can be expected to continue, indefinitely, and constitutes a substantial handicap for such individual. As defined by the Director of Developmental Services, in consultation with the Superintendent of Public Instruction, this term shall include mental retardation, cerebral palsy, epilepsy, and autism. This term shall also include handicapping conditions found to be closely related to mental retardation or to require treatment similar to that required for mentally retarded individuals, but shall not include other handicapping conditions that are solely physical in nature."

[5]The Welfare and Institutions Code defines "mentally retarded persons" as "those persons, not psychotic, who are so mentally retarded from infancy or before reaching maturity that they are incapable of managing themselves and their affairs independently, with ordinary prudence, or of being taught to do so, and who require supervision, control, and care, for their own welfare, or for the welfare of others, or for the welfare of the community." (§ 6500.)

retarded person may be committed to the State Department of Health unless he is a danger to himself or others (§ 6500.1), unless he happens already to be a voluntary or nonprotesting resident of a state hospital (§ 6514). In the latter case, being a developmentally disabled person, he is subject to the commitment procedures here under review. (§§ 6513-6514.)

Finally, involuntary commitment for all other classifications of developmentally disabled persons is authorized only upon proof of dangerousness. Section 4507 (formerly Health & Saf. Code, § 38007) provides: "Developmental disabilities alone shall not constitute sufficient justification for judicial commitment. Instead, persons with developmental disabilities shall receive services pursuant to this division. Persons who constitute a danger to themselves or others may be judicially committed if evidence of such danger is proven in court."

Appellant contends that he has been denied equal protection of the laws because the procedure under which a developmentally disabled person who is a voluntary or nonprotesting resident of a state hospital may be involuntarily committed provides a less exacting standard than that required for the commitment of all other developmentally disabled persons.

Since the issues raised in this appeal do not involve the testimony taken at the commitment hearing, it is unnecessary to include any factual statement beyond the uncontroverted facts that appellant was a patient at Patton State Hospital in San Bernardino County and that his commitment to the State Department of Health was predicated upon findings that he is a developmentally disabled person, that he is not capable of providing for his basic needs for food, clothing, and shelter, that he is not able to protect himself from ordinary threats to life, health, or safety, and that he is not willing to accept suitable treatment on a voluntary basis within the meaning of section 6513 et seq. There was no finding, and indeed no evidence, that he is presently a danger to himself or others.

Clearly the effect of the statutory scheme is to single out developmentally disabled persons who are voluntary or nonprotesting residents in state hospitals from developmentally disabled persons generally to require a less exacting standard for commitment. Having generally made dangerousness a prerequisite to hospitalization for the developmentally disabled, the singling out of a group for disparate treatment can be

upheld only if there is at least a rational basis for the classification that is necessary to further the legitimate purpose of the law. ■ Moreover, "[t]he necessity for a rational distinction among persons whom the law treats differently is of particular importance in the area of involuntary commitment. Although normally any rational connection between distinctions drawn by a statute and the legitimate purpose thereof will suffice to uphold the statute's constitutionality [citation], closer scrutiny is afforded a statute which affects fundamental interests or employs a suspect classification. [Citations.] In such cases the state bears the burden of establishing both that the state has a compelling interest which justifies the law and that the distinction is necessary to further that purpose." (*In re Gary W.* (1971) 5 Cal.3d 296, 306 [96 Cal.Rptr. 1, 486 P.2d 1201].)

■ *In re Gary W.* involved a proceeding to confine a Youth Authority ward for treatment pursuant to Welfare and Institutions Code sections 1800-1803, for a period beyond the date on which his release would otherwise have been mandatory. The California Supreme Court held that the ward was entitled to a jury trial even though there was no statutory provision therefor, on the ground that there was no compelling state purpose justifying the distinction between such wards and other classes of persons subject to civil commitment proceedings to which the Legislature had extended the right to a jury trial.[6]

In *People* v. *Smith* (1971) 5 Cal.3d 313 [96 Cal.Rptr. 13, 486 P.2d 1213], the Supreme Court struck down the provision of Welfare and Institutions Code section 1802, which permitted the court to extend the Youth Authority's control over a ward committed after a conviction of a criminal offense for a period of five years, while permitting continued control over a ward received from the juvenile court for only two years. Again the court opined that the state's power to order the involuntary commitment of a person suspected of being a danger to the public is a proper case in which to impose upon the state the more onerous burden of demonstrating that there exists a compelling state interest and that the distinction is necessary in order to further that purpose. While recognizing that there is a rational basis for statutory differences in the duration of original commitments of persons committed to the Youth Authority from the juvenile court and persons committed after felony convictions in adult court, the court, nevertheless, concluded that no rational distinctions can be drawn among the various classes of persons committed to the Youth Authority with respect to their dangerousness or the anticipated duration

---

[6]The court cited the closely analogous civil commitment procedures for mentally disordered sex offenders and narcotics addicts, which provided for a jury trial.

of necessary treatment by reference to the nature of their original commitment.

In both of the above cases the Supreme Court emphasized that statutes authorizing involuntary commitment affect such a fundamental interest that any distinction between classes of persons subject to commitment must be necessary to further a compelling state interest.[7]

■ Our task is to determine what compelling state interest, if any, will be advanced by discriminating between developmentally disabled persons who are voluntary or nonprotesting residents of state hospitals and all other developmentally disabled persons. We find none.

Respondent suggests that such a compelling state interest may be found in the state's duty to protect those persons presently hospitalized by preventing their release if they are unable to survive in society. The need for the special classification, respondent argues, is that the state has already obligated itself to care for those persons presently residing in a hospital. It is doubtful that this basis for distinguishing between developmentally disabled voluntary and nonprotesting residents of state hospitals and other developmentally disabled persons would even meet the standard of showing a rational connection between the distinction drawn by the statute and the legitimate purpose thereof; it certainly does not meet the more rigorous standard enunciated in *In re Gary W.* and *People* v. *Smith.*

A close examination of the statute pertaining to all classes of developmentally disabled persons reveals that there are two primary state interests underlying the statutory purpose, namely, (1) the state's responsibility for its developmentally disabled citizens, which includes the responsibility to see that such citizens lead as independent, productive,

---

[7]Respondent argues that the procedures under sections 6513 and 6514 should be viewed differently from the commitments considered by the Supreme Court because here the commitment is not directly to a state hospital but to the State Department of Health for suitable care and treatment. This argument is unavailing because in determining what care and treatment is suitable the department nevertheless has the authority to place the person in a state hospital (§ 6514), and in such an event, regardless of the number of steps, the person will have been so committed without any inquiry into his dangerousness. Moreover, as a practical matter, since the developmentally disabled persons with which we are concerned are already in state hospitals and the petitions are brought when they seek to get out and a regional center must have found them to be in continued need of state hospital care, it would undoubtedly be a rare case indeed in which the Department would not order commitment to a state hospital; to make the distinction suggested by respondent would be to ignore reality.

and normal lives as possible and that their individual integrity and liberty is respected and not needlessly restricted unnecessarily (see §§ 4501, 4502, formerly Health & Saf. Code, §§ 38001, 38002), and (2) protection of society and of developmentally disabled persons from harm resulting from those whose disability makes them dangerous (see §§ 6500.1, 4507, formerly Health & Saf. Code, § 38007).

Neither of these legislative goals are served by distinguishing between those who are presently voluntary or nonprotesting residents of state hospitals and others who are similarly disabled but are either not residents of a state hospital or are there by reason of previous judicial commitment on the ground of dangerousness. Nevertheless, of all developmentally disabled persons within the state only those who are presently voluntary or nonprotesting residents may be involuntarily committed without proof of dangerousness.

Respondent's argument that because the state has already obligated itself to those who are presently residing in a state hospital it has a compelling interest in protecting them would be equally applicable whether they are there by judicial commitment or as voluntary or nonprotesting residents. Yet a different standard is applicable for future commitment of the two classes of residents. Respondent's argument presupposes that those who are voluntary or nonprotesting residents of state hospitals would have no family or community resources available to them *because* they have been residents of state hospitals. We do not see their situation as significantly different from that of mentally retarded persons who were in the custody of a state hospital pursuant to an order of judicial commitment as a mentally retarded person made prior to January 1, 1976. Yet with respect to such mentally retarded persons the law requires that further judicial commitment shall be under the provisions of sections 6500 and 6500.1, and such provisions require proof of dangerousness. (See § 4509, formerly Health & Saf. Code, § 38009.)

Moreover, respondent's argument fails entirely to account for permitting developmentally disabled persons generally to be committed if they are shown to be a danger to others and yet permitting developmentally disabled voluntary or nonprotesting residents of state hospitals to be committed without such a showing. Of course, behind the setting of either or both such standards are the state's interests in preserving to the extent possible the individual integrity and liberty of its developmentally disabled citizens and in protecting society from dangerous persons. But it is the *distinction,* and not any one or more individual standards, that must

be justified by some compelling basis in reason. While either standard can be rationalized by reference to one or the other interest, for the distinction we see no basis whatsoever. In setting this part of the standard for commitment, whether or not a developmentally disabled person is a voluntary or nonprotesting resident of a state hospital has no apparent relationship to furthering any state interest.

We are compelled to conclude that use of a different standard for commitment of developmentally disabled persons who are voluntary or nonprotesting residents of a state hospital than for all other developmentally disabled persons is arbitrary and unnecessary to the attainment of any proper legislative purpose.[8]

▮ The principle that all persons similarly situated who are subject to involuntary commitment procedures should be accorded similar protections was recognized by the California Supreme Court in *In re Gonzales* (1971) 6 Cal.3d 346 [99 Cal.Rptr. 17, 491 P.2d 809], where the court considered the effect of the provisions of the Lanterman-Petris-Short Act (§§ 5000-5401) upon persons committed under former provisions of law. In holding that the Legislature intended that persons committed under former section 5567 (as dangerously mentally ill) should not be automatically released, but should be accorded the benefits of conservatorship proceedings under the new act the court stated: "Such an approach accords those committed under former provisions of the law the same protections and rights of review, procedural and otherwise, as are provided to those detained under the new LPS act, *and so does not deny equal protection of the law to the former group of patients.* (See *Baxstrom* v. *Herold* (1966) 383 U.S. 107, 110-111 . . . .)" (*Id.,* at p. 351, italics added.)

In *Baxstrom* v. *Herold, supra,* 383 U.S. 107 [15 L.Ed.2d 620, 86 S.Ct. 760], the United States Supreme Court struck down those portions of the New York correction law for civil commitment that authorized civil commitment upon the expiration of the prison term of a mentally ill person simply upon a showing that the person required care and treatment. The court stated: "We hold that petitioner was denied equal protection of the laws by the statutory procedure under which a person may be civilly committed at the expiration of his penal sentence without the jury review available to all other persons civilly committed in New

---

[8]Even if the statute is interpreted as requiring a least restrictive placement hearing, it still fails to meet equal protection requirements so long as hospital placement is authorized by use of a different standard from that accorded all other developmentally disabled persons.

York. Petitioner was further denied equal protection of the laws by his civil commitment to an institution maintained by the Department of Correction beyond the expiration of his prison term without a judicial determination that he is dangerously mentally ill such as that afforded to all so committed except those, like Baxstrom, nearing the expiration of a penal sentence." (*Id.,* at p. 110 [15 L.Ed.2d at p. 623].)

In the instant matter, just as in *Baxstrom,* all others similarly disabled are afforded a judicial hearing on the issue of dangerousness prior to commitment. Equal protection demands that appellant receive the same.

The judgment is reversed, and the case is remanded to the superior court for further proceedings according to appellant all the rights accorded all other developmentally disabled persons.

Gardner, P. J., and McDaniel, J., concurred.

On September 19, 1978, the opinion was modified to read as printed above.