CHIN, J., Concurring and Dissenting.
I concur in the majority’s conclusion
that under the circumstances of this case, Family Code section 3104[1] governs the request of respondents Leanne Harris and Charles Harris, Jr. (Grandparents) for visitation with their granddaughter Emily.
However, I disagree with the majority’s unprecedented and troubling conclusion that if a noncustodial parent supports a grandparent’s visitation request, a visitation order like the one at issue here—which required a six-year-old child to fly unaccompanied to another state and effectively transferred her custody to a nonparent in another state for extended time periods—does not even implicate a custodial parent’s constitutional right. This conclusion finds no support in the decisions of the high court and is contrary to case law both in California and elsewhere. In my view, the relevant authority establishes that court-ordered visitation by a grandparent *235 against the wishes of a fit custodial parent infringes on that parent’s fundamental right to direct his or her child’s upbringing, and that this state infringement on a parent’s fundamental right is unconstitutional absent clear and convincing evidence to rebut the presumption under section 3104, subdivision (f), that such visitation is not in the child’s best interests. I dissent to the extent the majority holds otherwise.
Factual Background
Appellant Karen Butler (Karen) married respondent Charles Erik Harris (Charles) in January 1994. They separated in October 1994, only 10 days before the birth of their daughter, Emily. Karen formally filed for dissolution of marriage in January 1995, asserting that Charles had been psychologically and physically abusive to her. Charles admitted hitting Karen twice after an argument and biting her on another occasion. In July 1995, pursuant to stipulation, the trial court ordered entry of a judgment of dissolution. The court’s order awarded Karen “sole legal custody” and “sole physical” custody of Emily. By statute, the court’s award of sole legal custody to Karen bestowed on her the exclusive “right and . . . responsibility to make the decisions relating to the health, education, and welfare of’ Emily. (§ 3006.) Similarly, by statute, the court’s award to Karen of sole physical custody placed Emily “under” Karen’s exclusive “supervision,” “subject to the power of the court to order visitation.” (§ 3007.) Regarding visitation, the court granted Charles supervised visits if he complied with certain conditions. Finally, the court’s order specified that there would be no change in these arrangements absent “a showing of substantial change in circumstances.”
In August 1995, Grandparents were joined “as parties to” the dissolution action pursuant to stipulation. The court’s order joining Grandparents provided that they were bound by the terms of the stipulated judgment between Karen and Charles, including the award to Karen of sole legal and physical custody.
During the ensuing years, there were numerous proceedings and court orders involving the question of visitation by Grandparents. In May 1999, the court granted Grandparents weeklong visits four times per year until Emily started school, and specified that Grandparents were not to permit Charles to have contact with Emily during those visits. In February 2000, Charles informed Karen that he was living with Grandparents. Nevertheless, Grandparents assured Karen that Charles would have no contact with Emily during her next visit.
Because the court’s order of May 1999 governed only until Emily started school, Grandparents filed an order to show cause in May 2000 requesting the *236 following visitation after Emily began kindergarten in August 2000: two weeks in August, one week during the Christmas/New Year’s period, one week during Easter, and one week in June. To accomplish these visits, they asked the court to order Karen to put six-year-old Emily on a plane by herself and send her from her home in Salt Lake City to San Diego, where Grandparents lived. They also asked the court for permission to take Emily to visit relatives in Northern California and Missouri upon giving Karen notice and information regarding itinerary and contact numbers. Finally, they asked the court to grant Charles supervised visitation with Emily during her visits with Grandparents.
Karen opposed Grandparents’ request. She objected generally that, although she was willing to work out visitation with Grandparents, she did not think visitation should be court ordered. More specifically, she expressed concern that court-ordered visitation would cause Emily to feel that her mother had “no control over what happens to her.” Karen also expressed concern that the visits to California uprooted Emily from her new family in Utah and hindered Karen’s efforts to integrate Emily into the new family. In her opposition declaration, Karen stated her concern that the extensive court-ordered visitation Grandparents were requesting would “destroy the feeling of belonging that every child needs in order to feel safe and secure with her family in her home.” Finally, Karen objected to having a court order her to “put[] her ... six year-old daughter on a plane by herself to go to” visit Grandparents in California.
The trial court granted Grandparents’ visitation request. It did not “question[]” Karen’s “motivation” or the sincerity of her belief that “it is best for this child if [Karen] provides the family unit and she makes the decisions as to what contact, if any, would exist between other people and this child.” However, the court was of the “firm belief’ that Emily would “be better off with some meaningful relationship with . . . extended family,” and it saw no “realistic possibility” that Karen “would do anything to encourage the relationship” between Emily and Grandparents “in spite of what she [said].” Thus, after finding that it was in Emily’s “best interest ... to continue to have a significant relationship with the Grandparents,” the court ordered the following: (1) each year, Emily would have to visit Grandparents in San Diego for 12 days in August, from December 26 to 31, and for 12 days in June; (2) starting in December 2000, when Emily was only six years old, Karen would have to put Emily on a plane in Salt Lake City to fly to California by herself; and (3) during Emily’s visits, Grandparents could take her to see relatives in California or any other state, and had to inform Karen of Emily’s whereabouts only if they took her “out of [San Diego] County overnight.”
*237 The Court of Appeal reversed, finding that the visitation order violated both the California and United States Constitutions. The court explained that the governing statute was section 3104, subdivision (f), which provides: “There is a rebuttable presumption affecting the burden of proof that the visitation of a grandparent is not in the best interest of a minor child if the parent who has been awarded sole legal and physical custody of the child in another proceeding . . . objects to visitation by the grandparent.” The court next held that although the statute, as written, does not violate the federal Constitution, it violates a parent’s “fundamental liberty interest” under the state Constitution unless “read” to require enforcement of the custodial parent’s decision absent “clear and convincing evidence that the child will suffer harm or potential harm if visitation is not ordered.” The court then held that the application of the statute here violated Karen’s state and federal constitutional rights because the trial court “did nothing more than apply a bare-bones best interest test and did not accord” Karen’s decision “any deference or material weight.”
Discussion
A. Custodial Parents Have a Fundamental Constitutional Right to Make Decisions Regarding Their Children.
“ ‘Personal liberty is a fundamental interest, second only to life itself, as an interest protected under both the California and United States Constitutions.’ [Citation.]” (In re Roger S. (1977) 19 Cal.3d 921, 927 [141 Cal.Rptr. 298, 569 P.2d 1286].) “[I]nclude[d]” in this “constitutionally protected ‘liberty’ ” interest is “the right” of a parent “to ‘bring up children’ [citation] and to ‘direct [their] upbringing and education.’ ” (Id. at p. 928.) Indeed, we have held that “the interest of a parent in the companionship, care, custody, and management of his [or her] children is a compelling one, ranked among the most basic of civil rights. [Citations.]” (In re B.G. (1974) 11 Cal.3d 679, 688 [114 Cal.Rptr. 444, 523 P.2d 244].) Similarly, a plurality of the United States Supreme Court recently stated that a parent’s “liberty interest... in the care, custody, and control of [his or her] children ... is perhaps the oldest of the fundamental liberty interests recognized by” the high court. (Troxel v. Granville (2000) 530 U.S. 57, 65 [147 L.Ed.2d 49, 120 S.Ct. 2054] (plur. opn. of O’Connor, J.) (Troxel).) In short, over the years, “constitutional interpretation” by both this court and the high court “has consistently recognized that the parents’ claim to authority in their own household to direct the rearing of their children is basic in the structure of our society. ‘It is cardinal . . . that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor hinder.’ ” (Ginsberg v. New York (1968) *238 390 U.S. 629, 639 [20 L.Ed.2d 195, 88 S.Ct. 1274].) “[T]he state has no general authority to dictate to parents the manner in which they should rear their children.” (In re Marriage of Wellman (1980) 104 Cal.App.3d 992, 996 [164 Cal.Rptr. 148] (Wellman).)
“ ‘Encompassed within [this] well-established fundamental right of parents to raise their children is the right to determine with whom their children should associate. [Citation.]’ [Citation.]” (Punsly v. Ho (2001) 87 Cal.App.4th 1099, 1107 [105 Cal.Rptr.2d 139].) Indeed, “[d]eciding when, under what conditions, and with whom their children may associate is among the most important rights and responsibilities of parents.” (Hoff v. Berg (1999) 1999 ND 115 [595 N.W.2d 285, 291] (Hoff).) Thus, this “decisionmaking function lies at the core of parents’ liberty interest in the care, custody, and control of their children.” (Lulay v. Lulay (2000) 193 Ill.2d 455 [739 N.E.2d 521, 531, 250 Ill.Dec. 758] (Lulay); see also Troxel, supra, 530 U.S. at p. 80 (conc, opn. of Thomas, J.) [“parents have a fundamental constitutional right to rear their children, including the right to determine who shall educate and socialize them”].)
B. Court-ordered Visitation Infringes on the Constitutional Right of Custodial Parents to Direct Their Children’s Upbringing.
In several ways, court orders granting visitation rights to third parties, including grandparents, infringe on the constitutional right of custodial parents to direct their children’s upbringing. As noted above, both the federal and state Constitutions establish the right of custodial parents to decide with whom their children will associate. Obviously, court-ordered visitation over a custodial parent’s objection infringes on that right. Moreover, California courts have long held that visitation is really just “a limited form of custody during the time the visitation rights are being exercised.” (Perry v. Superior Court (1980) 108 Cal.App.3d 480, 483 [166 Cal.Rptr. 583]; see also In re Marriage of Gayden (1991) 229 Cal.App.3d 1510, 1517 [280 Cal.Rptr. 862] (Gayden); Guardianship of Martha M. (1988) 204 Cal.App.3d 909, 912 [251 Cal.Rptr. 567]; Wellman, supra, 104 Cal.App.3d at p. 996.) Thus, a court order granting visitation rights to a third party is in essence an order transferring custody of the child from the custodial parent to the third party. In this sense, court-ordered visitation clearly constitutes a significant infringement of a custodial parent’s constitutional right to the companionship, care, custody, and management of his or his children. (See Lulay, supra, 739 N.E.2d at p. 532 [“by allowing the state ... to force parents to deliver their children to individuals whom the parents have decided the children should not see,” statute permitting grandparents to obtain court-ordered visitation “significantly interferes with a fundamental constitutional right”].)
*239 The visitation ordered in this case well illustrates the extent to which court-ordered visitation infringes on a custodial parent’s constitutional right. As noted above, the trial court here ordered that three times a year, starting when Emily was only six years old, Karen would have to put Emily on a plane in Salt Lake City to fly to California by herself, thus transferring Emily’s care and custody to Grandparents for extended periods of time. The visitation periods the court specified meant that Emily would be separated from the rest of her family in Utah during the Christmas/New Year’s holiday period and parts of the summer vacation period. Moreover, the court ruled that during these periods of transferred custody, Grandparents could take Emily anywhere else in the United States to see other relatives, with the only limitation being that if they took Emily “out of [San Diego] County overnight,” they had to inform Karen of Emily’s whereabouts. Clearly, the court’s visitation order significantly infringed on Karen’s constitutional right to direct Emily’s upbringing.
Court-ordered visitation also infringes on a custodial parent’s constitutional right in another, more general sense. As a majority of the high court recently recognized, where, as here, third parties ask a court to override a custodial parent’s decision and to order visitation, “the burden of litigating” the visitation request “can itself be ‘so disruptive of the parent-child relationship that the constitutional right of a custodial parent to make certain basic determinations for the child’s welfare becomes implicated.’ [Citation.]” (Troxel, supra, 530 U.S. at p. 75 (plur. opn. of O’Connor, J.), quoting id. at p. 101 (dis. opn. of Kennedy, J.).) In response to a visitation request, custodial parents “must presumably hire attorneys, and then present evidence and defend their decision regarding the visitation before a trial court. The parents’ authority over their children is necessarily diminished by this procedure.” (Lulay, supra, 739 N.E.2d at pp. 531-532.) Court-ordered visitation also undermines the child’s “ ‘trust that the adults who are responsible for him are the arbiters of his care and control ....’” (Gayden, supra, 229 Cal.App.3d at p. 1517.) Thus, “judicially compelled visitation against the wishes of’ a custodial parent “can significantly affect parental authority and the strength of the family unit.” (Ibid.) “This can only be characterized as a significant interference with parents’ fundamental right to make decisions regarding the upbringing of their children.” (Lulay, supra, 739 N.E.2d at p. 532.)
C. Court-ordered Visitation by a Third Party Infringes on a Custodial Parent’s Constitutional Rights Regardless of the Noncustodial Parent’s Support for Visitation.
In its analysis, the majority stresses the fact that Emily’s father, Charles, “supported” Grandparents’ visitation request. (Maj. opn., ante, at *240 pp. 226-228, 230.) According to the majority, when a state, at the request of a third party, steps in and overrides the decision of a fit parent with sole legal and physical custody regarding visitation by that third party, the state’s act of interference does not even “infringe[]” on the custodial parent’s constitutional rights if the noncustodial parent supports the visitation request. (Ibid.)
For several reasons, I disagree with the majority’s view that a noncustodial parent’s support for a third party’s visitation request completely negates the custodial parent’s constitutional right to make parenting decisions without state interference. First, the majority fails to explain why, as either a factual or legal matter, such support has any effect on this constitutional right. As noted above, in July 1995, Charles stipulated that Karen would have “sole legal custody” and “sole physical” custody of Emily. Thus, Charles agreed that Karen would have the exclusive “right and . . . responsibility to make the decisions relating to” Emily’s “health, education, and welfare” (§ 3006) and that Emily would be “under” Karen’s exclusive “supervision.” (§ 3007.) By doing so, Charles waived his right to have any legal say in most of the decisions regarding Emily’s upbringing, including the decision as to whether she may associate with particular individuals. Given Charles’s stipulation and its legal effect under California law, Charles’s support for Grandparents’ visitation request is legally irrelevant and does not affect the constitutional protection to which Karen, as Emily’s sole legal custodian, is entitled against state interference with her parenting decisions. The majority neither explains its contrary view nor cites any supporting authority.[2]
Second, the majority’s view is inconsistent with precedent, both in California and elsewhere. The decision most directly on point is perhaps In re Marriage of Howard (Iowa 2003) 661 N.W.2d 183 (Howard). There, after a child’s parents divorced, the paternal grandparents filed a petition to enforce their right under Iowa statutes to visit their grandchild. (Id. at p. 186.) Their petition was opposed by the child’s mother, but was supported by their son, the child’s father, who had joint legal custody of the child. (Id. at pp. 185-186.) The trial court granted the petition and ordered visitation. (Id. at pp. 186-187.) The Iowa Supreme Court reversed, finding that the statute on which the order was based unconstitutionally “interfere^] with” the mother’s “fundamental interest” under the Iowa Constitution in directing her child’s upbringing. (Id. at p. 189.) In reaching its conclusion, the court expressly rejected the view the majority here adopts without analysis, i.e., if one parent supports a third party’s visitation request, then court-ordered *241 visitation does not infringe on the other parent’s constitutional rights. More specifically, the court rejected the argument that “a lesser degree of scrutiny” is required in cases involving “a divorced family with two parental decision-makers who have different opinions on the scope of their daughter’s visitation with her grandparents.” (Id. at p. 188.) This fact, the court explained, does “not alone diminish the fundamental interest of parents who make caretaking decisions” or “permit[] the state to make choices for an objecting parent (or parents) . . . .” (Ibid.) Thus, the court held, despite the father’s support for the grandparent’s visitation request, the statute authorizing the visitation order “interfere[d] with” the mother’s “fundamental interest” and was constitutionally permissible only if it was narrowly tailored to serve “a compelling interest.” (Id. at p. 189.)
The Iowa Supreme Court’s analysis in Howard echoes the analysis our own Courts of Appeal have adopted in determining whether and when the state may intervene to resolve disputes between divorced parents. In In re Marriage of Mentry (1983) 142 Cal.App.3d 260 [190 Cal.Rptr. 843] (Mentry), a trial court issued an order restraining a divorced father from involving his children in any religious activity during his visits with them. (Id. at pp. 261-262.) The Court of Appeal reversed, holding in part that the order was “an unwarranted intrusion into family privacy.” (Id. at p. 262.) The court first noted that case law in California “reflectas] a salutary judicial disinclination to interfere with family privacy without the evidentiary establishment of compelling need. [Citation.]” (Id. at p. 266.) It then explained: “The rationale that supports judicial respect for family privacy does not lose its force upon the dissolution of marriage .... The concept of family privacy embodies not simply a policy of minimum state intervention but also a presumption of parental autonomy. Many of the purposes served by this presumption become more important after dissolution than they were before. One such purpose, for example, is to diminish the uncertainties and discontinuities that can afflict the parent-child relationship whenever third parties (lawyers as well as judges) episodically intrude through an ill-equipped adversarial process in which decisions are subject to reconsideration and eventual appellate review. Such uncertainties and discontinuities are of course more likely . . . after separation or dissolution than before. . . . For these reasons, among others, considerations of family privacy and parental autonomy should continue to constrain the exercise of judicial authority despite the fact that the family is no longer intact; indeed, such considerations more often than not gain force because the family is no longer intact.” (Id. at pp. 267-268, fns. omitted.) Thus, the court held, where the propriety of a given decision rests on “debatable value judgments,” the state may not “intervene” to resolve parental disputes absent “a clear affirmative showing of harm or likely harm to the child.” (Id. at p. 269.)
*242 Decisions from other states are in accord with the analysis in Howard and Mentry, including some that specifically involve statutes granting visitation rights to grandparents. For example, in Beagle v. Beagle (Fla. 1996) 678 So.2d 1271, 1273, the Florida Supreme Court considered the constitutionality of a Florida statute permitting a court to order visitation by grandparents where the child is living with both parents and “either or both” of them objects. The court held that even where only “one parent” objects to visitation by the grandparents, a judicial visitation order constitutes “[s]tate interference with the fundamental right” of the objecting parent under the Florida Constitution “to raise [his or her] children,” and that this act of state interference is constitutionally impermissible absent a “compelling state interest.”[3] (Beagle, at p. 1276.)
In Rust v. Rust (Tenn.Ct.App. 1993) 864 S.W.2d 52, 53, a Tennessee appellate court considered the constitutionality of a trial court order, issued at the request of a divorced father, prohibiting a divorced mother with sole custody of the couple’s children from home-schooling the children and requiring her to enroll them in public or private school. In reversing, the appellate court held that the order impermissibly interfered with the mother’s “fundamental liberty interest” under the state Constitution “to raise [her] own children as [she] see[s] fit.” (Id. at p. 55.) The court reasoned that a final custody order “creates new legal relationships between the parents themselves and between each parent and the child or children. It also creates a new family unit now commonly referred to as a ‘single parent family,’ ” which “is entitled to a similar measure of constitutional protection against unwarranted governmental intrusion as is accorded to an intact, two-parent family. [Citations.] Unless the court modifies its custody order, a custodial parent should be permitted to make the significant, life-influencing decisions affecting his or her child as long as the parent remains fit to have custody.” (Id. at p. 56.) Thus, the court held, judicial orders that interfere with the decisions of custodial parents infringe on the constitutional rights of those parents notwithstanding the wishes of the noncustodial parent. (Ibid.)
As these decisions demonstrate, courts in California and elsewhere agree that when the state steps in and interferes with a parent’s decision regarding *243 his or her child, the parent’s constitutional rights have been infringed on whether or not the other parent supports the state’s decision. They support the conclusion that the trial court’s visitation order here infringed on Karen’s constitutional rights notwithstanding Charles’s support for Grandparents’ request. The majority’s contrary conclusion is inconsistent with these decisions.
The only justification the majority gives for its conclusion is that nothing in Troxel or the California decisions Karen cites suggests that a visitation order supported by one parent infringes on the parental rights of the other parent. (Maj. opn., ante, at pp. 855-856, 858.) However, nothing in any of those decisions supports the majority’s view, and the majority does not contend otherwise. Nor does anything in those decisions support the majority’s view that, for purposes of third party visitation, there is a constitutionally significant difference between a “sole surviving parent” and a divorced parent with sole legal custody of his or her child. (Maj. opn., ante, at pp. 226-227.) Again, the majority does not contend otherwise. Finally, the majority offers no persuasive reason for ignoring the constitutional privacy decisions of this court that Karen cites; without analysis, the majority summarily disregards those decisions merely because they involved a different factual “context.” (Maj. opn., ante, at p. 229.) In short, the majority unjustifiably ignores relevant decisions that support Karen’s position while citing absolutely no positive support for its conclusion that Charles’s endorsement of Grandparents’ visitation request completely negates Karen’s constitutional right to make parenting decisions without state interference.
I disagree with the majority’s view for one additional and important reason: its implications and consequences. It is a fundamental precept that constitutional due process protections do not apply if no state action implicates or infringes upon a constitutionally protected right or interest. (See, e.g., Board of Regents v. Roth (1972) 408 U.S. 564, 569 [33 L.Ed.2d 548, 92 S.Ct. 2701] [constitutional due process protections “apply only to the deprivation of interests encompassed by the Fourteenth Amendment’s protection of liberty and property”].) In light of this precept, if, as the majority holds, court-ordered visitation under the circumstances here does not even “infringen upon” a custodial parent’s constitutional rights (maj. opn., ante, at pp. 226-228, 230), then so long as a third party’s visitation request is supported by a noncustodial parent, there is no constitutional constraint on the state’s power to step in and override the custodial parent’s decision. Thus, under the majority’s holding, the state may, if it wants, authorize a court considering such a supported request to issue a visitation order ex parte and without providing the custodial parent either notice or a hearing. The state may also set any (or no) standard for granting such a request or impose the burden of proof on a custodial parent to show why it should be denied. Because I find the majority’s conclusion as troubling as it is unprecedented, I *244 reject it.[4] (Cf. Santosky v. Kramer (1982) 455 U.S. 745, 754, fn. 7 [71 L.Ed.2d 599, 102 S.Ct. 1388] (Santosky) [“that important liberty interests of the child and its foster parents may also be affected by a permanent neglect proceeding does not justify denying the natural parents constitutionally adequate procedures”].)
D. The Visitation Order Here Is Unconstitutional Absent Clear and Convincing Evidence to Overcome the Presumption that Visitation Is Not in the Child’s Best Interests.
Not every state act that infringes on a fundamental constitutional right is unconstitutional. (See Carey v. Population Services International (1977) 431 U.S. 678, 686 [52 L.Ed.2d 675, 97 S.Ct. 2010] [regulation that burdens constitutional right of privacy “may be validated by a sufficiently compelling state interest”]; Citizens for Parental Rights v. San Mateo County Bd. of Education (1975) 51 Cal.App.3d 1, 12 [124 Cal.Rptr. 68] [“not all infringements of religious beliefs are constitutionally impermissible”].) “If the state is seeking to serve a compelling interest, an interference with a constitutional right is permissible if it is narrowly tailored. [Citation.]” (People v. Adams (1993) 19 Cal.App.4th 412, 441 [23 Cal.Rptr.2d 512].)
In constitutional terms, the interest the state seeks to serve through section 3104 is certainly compelling. “Numerous California decisions recognize that the state has a special and particularly compelling interest in protecting the health and welfare of children. [Citations.]” (American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307, 342 [66 Cal.Rptr.2d 210, 940 P.2d 797] (plur. opn. of George, C. J.); see also In re Marilyn H. (1993) 5 Cal.4th 295, 307 [19 Cal.Rptr.2d 544, 851 P.2d 826] [“the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect”].) Similarly, the United States Supreme Court has recognized that the state’s “interest in the welfare of the child” is “urgent.” (Lassiter v. Department of Social Services (1981) 452 U.S. 18, 27 [68 L.Ed.2d 640, 101 *245 S.Ct. 2153].) Thus, the critical question here is whether section 3104 is narrowly tailored to serve the state’s compelling interest in the welfare of children.
In answering this question, it is necessary first to consider how section 3104 operates. The statute permits a court, on petition of a grandparent, to grant “reasonable visitation rights to the grandparent.” (§ 3104, subd. (a).) It places two general limitations on a court’s power to grant such rights. First, a court must “[b]alance[] the interest of the child in having visitation with the grandparent against the right of the parents to exercise their parental authority.” (§ 3104, subd. (a)(2).) Second, a court may not award visitation rights unless it “[f]inds that there is a preexisting relationship between the grandparent and the grandchild that has engendered a bond such that visitation is in the best interest of the child.” (§ 3104, subd. (a)(1).) On the facts of this case, the statute places one additional limitation on a court’s power to grant visitation; because Karen has sole legal and physical custody and “objects to visitation,” the court must apply “a rebuttable presumption affecting the burden of proof that the visitation ... is not in the best interest of [the] child . . . .” (§ 3104, subd. (f).)
The majority holds that the rebuttable presumption in section 3104, subdivision (f), preserves the statute’s constitutionality as it applies in this case. In this regard, the majority summarily asserts that this presumption “prevents] the situation that arose in Troxel in which the court ordered visitation over the objection of the child’s sole surviving fit parent based upon a finding that such visitation was in the child’s best interest.” (Maj. opn., ante, at p. 226.)
Given the legal effect of the presumption under California law, the majority’s assertion is incorrect unless we require petitioning grandparents to rebut the presumption with clear and convincing evidence. Under our Evidence Code, “[t]he effect of a presumption affecting the burden of proof is to impose upon the party against whom it operates the burden of proof as to the nonexistence of the presumed fact.” (Evid. Code, § 606.) Thus, in this case, the rebuttable presumption under section 3104, subdivision (f), does nothing more than put the burden on Grandparents, as the parties against whom the presumption operates, to prove that denying visitation is not in Emily’s best interest.
In light of Evidence Code section 606, the rebuttable presumption under Family Code section 3104, subdivision (f), though sounding formidable, really does very little if it may be rebutted by a simple preponderance of the evidence. The structure of section 3104—which permits a visitation award only on a grandparent’s petition and a court’s finding that visitation is in the *246 child’s best interest—already suggests that the burden of proof regarding the child’s best interests should be on the grandparent, as the petitioning party. The rebuttable presumption seems merely to confirm this fact. As explained in the official comment to Evidence Code section 606 by the Assembly Committee on Judiciary, a presumption affecting the burden of proof has “no effect” where “the party against whom the presumption operates already has the same burden of proof as to the nonexistence of the presumed fact.” (Assem. Judiciary Com. com., 29B pt. 2 West’s Ann. Evid. Code, supra, foil. § 606, p. 65.) The official comment to Evidence Code section 606 also explains that “[i]n the ordinary case, the party against whom” such a presumption operates merely has “the burden of proving the nonexistence of the presumed fact by a preponderance of the evidence.” (Assem. Judiciary Com. com., 29B pt. 2 West’s Ann. Evid. Code, supra, foil. § 606, p. 64.) Consistent with this comment, Evidence Code section 115 provides that “[e]xcept as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence.” If the preponderance standard applies here, then the rebuttable presumption under Family Code section 3104, subdivision (f), simply puts the burden on a petitioning grandparent to convince a judge that visitation over the custodial parent’s objection is “more likely than not” in the child’s best interest. (Aguilar v. Atlantic Richfield Co. (2001) 25 Cal.4th 826, 845, 851 [107 Cal.Rptr.2d 841, 24 P.3d 493].) So construed, the presumption does not, as the majority asserts, “prevent the situation that arose in Troxel in which the court ordered visitation over the objection of the child’s sole surviving fit parent based upon a finding that such visitation was in the child’s best interest.” (Maj. opn., ante, at p. 226.) On the contrary, so construed, the presumption expressly contemplates and provides for that very situation. It also gives virtually no special weight to the custodial parent’s decision.
Contrary to the majority’s assertion, the high court in Troxel did not declare otherwise. (Maj. opn., ante, at p. 226.) The majority asserts that by citing section 3104 “with approval,” the “high court” in Troxel “recognized” that section 3104 “gives ‘special weight’ to the parents’ decision.” (Maj. opn., ante, at p. 226.) However, the citation to section 3104 on which the majority relies appeared in Justice O’Connor’s plurality opinion and was not endorsed by a majority of the court. (Troxel, supra, 530 U.S. at p. 70 (plur. opn. by O’Connor, J.).) Moreover, the plurality in Troxel did not cite section 3104 “with approval” (maj. opn., ante, at p. 226); it merely included a “cf.” citation to section 3104 after explaining that a Washington court, in granting visitation, had “failed to provide any protection for [the parent’s] fundamental constitutional right to make decisions concerning the rearing of her own daughters.” (Troxel, supra, 530 U.S. at p. 70 (plur. opn. by O’Connor, J.), italics added.) In context, this citation suggests that in the view of the Troxel *247 plurality, unlike the Washington court—which failed to provide any protection for a parent’s fundamental right—section 3104 provides at least some protection. However, the Troxel plurality did not, as the majority asserts, conclude or even suggest that the protection section 3104 provides is constitutionally adequate. On the contrary, the Troxel plurality expressly declined to specify what minimum level of protection is constitutionally required, explaining: “We do not, and need not, define today the precise scope of the parental due process right in the visitation context. . . . [T]he constitutionality of any standard for awarding visitation turns on the specific manner in which that standard is applied and ... the constitutional protections in this area are best ‘elaborated with care.’ [Citation.]” (Troxel, supra, 530 U.S. at p. 73.) Thus, contrary to the majority’s assertion, the Troxel plurality’s unadorned citation of section 3104 does not establish the statute’s constitutionality.
Nevertheless, we may “construe” the statute to preserve its constitutionality “by requiring clear and convincing evidence” to rebut the presumption that visitation by a petitioning grandparent over a custodial parent’s objection is not in the child’s best interest.[5] (Conservatorship of Wendland (2001) 26 Cal.4th 519, 543 [110 Cal.Rptr.2d 412, 28 P.3d 151] (Wendland).) Section 3104 is silent regarding the standard of proof, so construing it to require clear and convincing evidence “does not entail a deviation from the language of the statute . . . .” (Wendland, supra, 26 Cal.4th at p. 543.) As noted above, Evidence Code section 115 provides that the preponderance standard applies “[e]xcept as otherwise provided by law.” “ ‘Law,’ as referenced in [this section], includes ‘constitutional, statutory, and decisional law.’ (Evid. Code, § 160.)” (Weiner v. Fleischman (1991) 54 Cal.3d 476, 483 [286 Cal.Rptr. 40, 816 P.2d 892] (Weiner).) Taken together, these sections establish that the preponderance standard applies “ ‘unless a heavier or lesser burden of proof is specifically required ... by constitutional, statutory, or decisional law.’ ” (People v. Burnick (1975) 14 Cal.3d 306, 314 [121 Cal.Rptr. 488, 535 P.2d 352], italics omitted.) Thus, it is both necessary and appropriate for us to “determine whether constitutional, statutory or decisional law (i.e., case law) requires a burden of proof higher than preponderance of the evidence to” overcome the presumption under section 3104, subdivision (f). (Weiner, supra, 54 Cal.3d at p. 483; see also Santosky, supra, 455 U.S. at pp. 755-756 [determining “degree of proof required ... ‘is the kind of question which has traditionally been left to the judiciary’ ”].) We must ensure that the applicable *248 standard of proof “satisfies ‘the constitutional minimum of “fundamental fairness.” ’ [Citations.]”[6] (Santsoky, supra, 455 U.S. at p. 756, fn. 8.)
“The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to ‘instruct the factfinder concerning the degree of confidence our society thinks [the fact-finder] should have in the correctness of factual conclusions for a particular type of adjudication.’ [Citation.] The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.” (Addington v. Texas (1979) 441 U.S. 418, 423 [60 L.Ed.2d 323, 99 S.Ct. 1804] (Addington); see also In re Angelia P. (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198] [quoting Addington\.) As the high court has explained, where “society has a minimal concern with the outcome” of a case-—such as with “the typical civil case involving a monetary dispute between private parties”—the “preponderance” standard applies. (Addington, supra, 441 U.S. at p. 423.) Application of this relatively low standard reflects society’s “minimal concern” in these cases by allocating the risk of error “in roughly equal fashion.” (Ibid.; see also Weiner, supra, 54 Cal.3d at p. 488.)
On the other hand, in civil cases where “[t]he interests at stake . . . are . . . more substantial than mere loss of money,” the “clear and convincing evidence” standard applies. (Addington, supra, 441 U.S. at pp. 424-425.) Because society has a greater concern with the outcome of these cases, we apply a standard of proof “requiring that the evidence be ‘ “so clear as to leave no substantial doubt”; “sufficiently strong to command the unhesitating assent of every reasonable mind.” ’ [Citation.]” (In re Angelia P, supra, 28 Cal.3d at p. 919.) We have held that “[p]roof by clear and convincing evidence is required ‘where particularly important individual interests or rights are at stake,’ such as the termination of parental rights, involuntary commitment, and deportation. [Citation.]” (Weiner, supra, 54 Cal.3d at p. 487; see also Wendland, supra, 26 Cal.4th at pp. 546-547.) Similarly, the high court “has applied [this] standard in cases implicating fundamental liberty interests protected by the Fourteenth Amendment, such as proceedings to terminate parental rights [citation] . . . .” (Wendland, supra, 26 Cal.4th at pp. 546-547; see also Santosky, supra, 455 U.S. at p. 756 [“[t]his Court has mandated” the clear and convincing standard “when the individual interests at stake in a state proceeding are both ‘particularly important’ and ‘more substantial than mere loss of money’ ”]; Addington, supra, 441 U.S. at p. 424 [“this Court has used the ‘clear, unequivocal and convincing’ standard of proof to protect particularly important individual interests in various civil *249 cases”].) As the high court has explained, “adopting a ‘standard of proof is more than an empty semantic exercise.’ [Citation.] In cases involving individual rights, whether criminal or civil, ‘[the] standard of proof [at a minimum] reflects the value society places on individual liberty.’ [Citation.]” (Addington, at p. 425.)
Applying these principles, I conclude, as did the Court of Appeal, that the “clear and convincing evidence” standard must be applied in determining whether a court, on the state’s behalf, may grant visitation rights to grandparents over the objection of a child’s custodial parent. As explained above, a parent’s constitutionally protected liberty interest in directing his or her child’s upbringing is both fundamental and compelling; it is possibly the oldest fundamental liberty interest the high court has recognized and is ranked among the most basic of civil rights. (Troxel, supra, 530 U.S. at p. 65 (plur. opn. of O’Connor, J.); In re B.G., supra, 11 Cal.3d at p. 688.) As also explained above, the right of parents to decide with whom their children may associate lies at the core of this fundamental constitutional liberty interest. (Troxel, supra, 530 U.S. at p. 80 (conc. opn. of Thomas, J.); Punsly v. Ho, supra, 87 Cal.App.4th at p. 1107; Hoff, supra, 595 N.W.2d at p. 291; Lulay, supra, 739 N.E.2d at p. 531.) Of course, as already noted, the state has a compelling interest in the child’s welfare. Moreover, questions regarding visitation by third parties also implicate the child’s interests. (Troxel, supra, 530 U.S. at pp. 86, 88 (dis. opn. of Stevens, J.).) However, as the plurality in Troxel recently explained, “there is a presumption that fit parents act in the best interests of their children. ... [f] ... [f] Accordingly, so long as a parent [is fit], there will normally be no reason for the State to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent’s children. [Citation.]” (Id. at p. 68 (plur. opn. of O’Connor, J.).) Thus, until proven otherwise, “the child and his [or her] parents share a vital interest in preventing erroneous” state interference in their relationship, and their interests “coincide to favor use of error-reducing procedures.” (Santosky, supra, 455 U.S. at pp. 760-761.)
Moreover, the nature of the factual determination a court must make under section 3104—whether visitation is in the child’s best interests—heightens the risk of error. The high court has observed that the “ ‘best interests’ ” standard is “vague” and that “judges . . . utilizing [it] . . . may find it difficult ... to avoid decisions resting on subjective values.” (Smith v. Organization of Foster Families (1977) 431 U.S. 816, 835, fn. 36 [53 L.Ed.2d 14, 97 S.Ct. 2094]; see also Troxel, supra, 530 U.S. at p. 101 (dis. opn. of Kennedy, J.) [“best interests” test “has at times been criticized as indeterminate, leading to unpredictable results”].) In holding that the federal due process clause requires application of a clear and convincing evidence test in parental *250 neglect proceedings, the high court in Santosky also explained that because this “imprecise substantive standard!] . . . leave[s] determinations unusually open to the subjective values of the judge,” it “magnifies] the risk of erroneous factfinding.” (Santosky, supra, 455 U.S. at p. 762, italics added.) The court in Santosky went on to explain that “[c]oupled with a ‘fair preponderance of the evidence’ standard,” the best interest test “create[s] a significant prospect of erro[r].” (Id. at p. 764.) Given the weight of the parent’s interest, the high court concluded in Santosky that only the “ ‘clear and convincing evidence’ standard of proof . . . adequately conveys to the factfinder the level of subjective certainty about his factual conclusions necessary to satisfy due process.” (Id. at p. 769.) “ ‘The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.’ [Citation.]” (Id. at p. 768.)
In light of the weight of the parent’s interest at stake here, I similarly conclude that the “clear and convincing evidence” standard of proof is required with regard to section 3104. As the Court of Appeal held, this standard “is necessary to assure [that] adequate deference is accorded to a fit parent’s decisions about raising his or her children.” A lower standard of proof creates too great a risk of “having a court [merely] substitute its own views” regarding the child’s best interests “for those of a fit parent.” And, as the plurality explained in Troxel, “the Due Process Clause does not permit a State to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a ‘better’ decision could be made.” (Troxel, supra, 530 U.S. at pp. 72-73 (plur. opn. of O’Connor, J.).) Thus, I conclude that section 3104 is constitutional only if we construe it to require a finding that visitation over the objection of a custodial parent is not in the child’s best interest, absent clear and convincing evidence to the contrary, i.e., evidence “ ‘ “sufficiently strong to command the unhesitating assent of every reasonable mind.” ’ [Citation.]” [7] (In re Angelia R, supra, 28 Cal.3d at p. 919, 171 Cal.Rptr. 637, 623 P.2d 198.)
*251 Conclusion
I am not insensitive to the tremendous hurt most grandparents feel when they are cut off from their grandchildren. Moreover, like most people, I believe that grandparents generally should be an integral part of a child’s upbringing and that most of the time, they have an extremely positive impact on the child. Thus, “[i]n an ideal world, parents might always seek to cultivate the bonds between grandparents and their grandchildren.” (Troxel, supra, 530 U.S. at p. 70 (plur. opn. of O’Connor, J.).) Unfortunately, as we all know, “our world is far from perfect, and in it the decision whether such an intergenerational relationship would be beneficial ... is for the parent to make in the first instance.” (Ibid.) Family privacy is grounded on the right of parents to rear their children without unwarranted state interference. Therefore, the issue here is not whether interaction between grandparents and their grandchildren is desirable, but whether, and under what circumstances, the state may constitutionally interfere with the rights of a fit custodial parent by ordering visitation over the parent’s objection. Based on the governing precedent, I conclude that court-ordered visitation infringes on a custodial parent’s fundamental right to direct his or her child’s upbringing, and that this state infringement on a parent’s fundamental right is unconstitutional absent clear and convincing evidence to rebut the presumption under section 3104, subdivision (f), that such visitation is not in the child’s best interests. I dissent to the extent the majority holds otherwise.

 Except as otherwise indicated, all further statutory references are to the Family Code.

 Ironically, according to the majority, although Charles himself has no right to visit Emily, his support for Grandparents’ visitation request completely negates Karen’s constitutional rights and strips her of any constitutional protection against state interference with her parenting decisions as Emily’s sole custodian. Moreover, the trial court’s refusal to grant Charles even supervised visitation undermines the majority’s factually unsupported assertion that he is a “fit” parent. (Maj. opn., ante, at pp. 226-227.)

 The court limited its decision to situations “in which a child is living with both natural parents.” (Beagle v. Beagle, supra, 678 So.2d at p. 1272.) However, the court later disavowed this limitation and extended its analysis to situations where the child’s parents never married and never lived together. (Saul v. Brunetti (Fla. 2000) 753 So.2d 26, 28-29.) It also later applied this analysis to hold that an order transferring custody to grandparents based merely on a child’s best interests violates the constitutional rights of a divorced custodial parent, even if the noncustodial parent supports the grandparents’ request. (Richardson v. Richardson (Fla. 2000) 766 So.2d 1036, 1038.) More recently, the court noted that it “has consistently held all statutes that have attempted to compel visitation or custody with a grandparent based solely on the best interest of the child standard, without the required showing of harm to the child, to be unconstitutional.” (Sullivan v. Sapp (Fla. 2004) 866 So.2d 28, 37.)

 I note that the majority’s conclusion in this regard renders its earlier discussion of Troxel completely unnecessary. The plurality in Troxel concluded that the visitation order there at issue “infringefd] on” the parent’s “fundamental parental right” and that the infringement violated the federal “Due Process Clause” because the court issuing the order “accorded no deference,” “presumption of validity,” or “weight” to the parent’s decision. (Troxel, supra, 530 U.S. at p. 67 (plur. opn. of O’Connor, J.).) In other words, the federal due process clause was applicable—and required that some deference be given the parent’s decision—only because the order in Troxel infringed on the parent’s constitutional right. Under the majority’s conclusion that the order here does not infringe on Karen’s constitutional rights, both the federal due process clause and Troxel are irrelevant and there is no constitutional limitation on the state’s ability to step in and override Karen’s decision regarding third party visitation.

 Adopting this standard of proof in all visitation cases is not inconsistent with the Troxel plurality’s refusal to make broad pronouncements about a statute’s facial constitutionality. The high court “never has approved case-by-case determination of the proper standard of proof for a given proceeding.” (Santosky, supra, 455 U.S. at p. 757.) As the court has explained, because “the litigants and the factfinder must know at the outset of a given proceeding how the risk of error will be allocated, the standard of proof necessarily must be calibrated in advance.” (Ibid.)

 The Court of Appeal recognized this responsibility and construed section 3104 to require clear and convincing evidence. Despite this holding and the fact that the parties and amici curiae have briefed the issue in this court, the majority does not even mention it.

 Karen asserts, and the Court of Appeal held, that section 310R4 is unconstitutional unless construed to require a showing of actual or potential harm. In most cases, the elevated standard of proof I would impose—clear and convincing evidence to rebut the presumption that visitation over the custodial parent’s objection is not in the child’s best interest—will require grandparents seeking visitation to show that denial of visitation would result in some kind of harm or potential harm to the child. Moreover, as previously noted, in addition to a finding regarding the child’s best interest, section 3104 prohibits court-ordered visitation unless “there is a preexisting relationship between the grandparent and the grandchild that has engendered a bond” between them, and the court considers “the right of the parents to exercise their parental authority.” (§ 3104, subd. (a)(1), (2).) Given these requirements, I am not prepared to say that section 3104 is facially unconstitutional unless construed to require a showing of harm or potential harm. (See Troxel, supra, 530 U.S. at p. 73 (plur. opn. of O’Connor, J.) [declining to consider “whether the Due Process Clause requires all nonparental visitation statutes to include *251 a showing of harm or potential harm”]; id. at pp. 85-86 (dis. opn. of Stevens, J.) [rejecting view that showing of actual or potential harm is required]; id. at p. 94 (dis. opn. of Kennedy, J.) [rejecting view that showing of actual or potential harm is required in every case].) Of course, the statute’s application in any particular case may be unconstitutional. Whether that is so here cannot be determined until after the trial court has had an opportunity on remand to apply the correct standard of proof.